# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JOHN AGUAYO, SR.; DENIS AGUAYO and
JOHN AGUAYO, JR.,

       Plaintiffs,

vs.                                                                No. CIV 14-0400 JB/KBM

AMCO INSURANCE COMPANY,

       Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Motion to Remand, filed May 28, 2014 (Doc. 12)("Motion").  The Court held a hearing on August 7, 2014.  The primary issue is whether the Court should grant the Motion and remand this case to state court, because it was pending there for "more than 1 year" at the time of removal; or deny the Motion and keep the case on the ground that the Plaintiffs "acted in bad faith in order to prevent [Defendant AMCO Insurance Company] from removing the action."  28 U.S.C. § 1446(c)(1).  The Court interprets the bad-faith exception -- which is only two years old and which no court has yet comprehensively construed -- to require an inquiry into whether the plaintiff kept a removal-spoiling party in the case only for the purpose of preventing removal.  The Court construes this inquiry to entail a two-step standard.  First, the Court assesses whether the plaintiff actively litigated its case against the removal spoiler in state court.  A finding that the plaintiff did not actively litigate against the removal spoiler constitutes bad faith, and the Court will retain jurisdiction over the case.  If, on the other hand, the Court finds that the plaintiff actively litigated against the removal spoiler, that finding creates a rebuttable presumption that the plaintiff acted in good faith.  Second, the defendant may rebut the good-faith presumption, with

evidence already in the defendant's possession, that the plaintiff kept the removal spoiler in the case to defeat removal; the defendant will not, however, receive discovery or an evidentiary hearing in federal court to obtain such evidence.  The Court adopts an expansive view of active litigation: the plaintiff need not expect to recover damages from the removal-spoiling defendant; if the plaintiff keeps the removal spoiler joined to obtain discovery from him or her, to force a settlement, to pressure the removal spoiler to testify on the plaintiff's behalf against other defendants, or to obtain a judgment against the removal spoiler that the plaintiff knows the removal spoiler cannot pay, the Court will consider the plaintiff to have actively litigated against the removal spoiler, and unless the removing defendant can adduce other evidence of bad faith, such as communications from the plaintiff directly attesting to bad faith, the Court will presume good faith and remand the case.  In this case, the Plaintiffs actively litigated both against Defendant Michael Trujillo, whom the Plaintiffs twice deposed, and against Defendants Trace Spoonhoward, the New Mexico State Police ("NMSP"), and the State of New Mexico (collectively, "the State Defendants"), with whom the Plaintiffs settled, thus entitling them to a rebuttable presumption of good faith.  AMCO Insurance has introduced no direct or convincing circumstantial evidence of bad faith, and has therefore failed to rebut the presumption.  The Court, accordingly, grants the Motion and remands the case to state court.

## FACTUAL BACKGROUND

The Court takes its facts from the Third Amended Complaint for Damages, filed in state court December 6, 2013, removed to federal court April 29, 2014 (Doc. 11-8, at 7-22)("Complaint").[1]  This case arises out of the July, 2010, murder of a young man, Christopher

---

[1] The Court will cite to the Complaint's internal pagination -- the black number at the bottom center of the page -- rather than CM/ECF's pagination -- the blue number at the top right of the page.

Aguayo, by another young man, Michael Trujillo, using a gun belonging to Trujillo's surrogate father, Spoonhoward, an officer with the NMSP.  Complaint ¶¶ 12-24, at 3-4.   All events occurred in Santa Fe, New Mexico, see Complaint ¶ 2, at 2, and all persons involved are New Mexico citizens with the exception of AMCO Insurance, which is a foreign corporation,[2] see Complaint ¶¶ 3, 5-11, at 2-3.

Trujillo lived with his mother and Spoonhoward, who was not Trujillo's biological father, but to whom Trujillo would commonly refer as his "dad."  Complaint ¶ 23, at 4.  See id. ¶ 26, at 4.  Trujillo had disciplinary problems: in 2006, he was caught taking a pellet gun from his home to his school; in 2007, he was involved in a fight with another student at his high school; in 2009, his mother had reported him missing, and, when police found him, they reported that he was "belligerent, verbally abusive and that he referred to an officer as a pig."  Complaint ¶ 27, at 5 (internal quotation marks omitted)(quotation unattributed).  See id. ¶¶ 28-29, at 5.  Trujillo's mother acknowledges that she had "extreme difficulties with her son" and worried that he might be in a gang.  Complaint ¶ 28, at 5 (internal quotation marks omitted)(quotation unattributed). See id. ¶ 26, at 4-5.  It is unclear what role Spoonhoward played in Trujillo's life over the years, but Spoonhoward was aware of Trujillo's disciplinary issues and of his possible gang affiliation. See Complaint ¶ 30, at 5.

The NMSP had issued Spoonhoward a .357 Smith & Wesson pistol.  See Complaint ¶ 17, at 3; id. ¶¶ 23-24, at 4.  Pursuant to New Mexico Department of Public Safety ("NMDPS") policy, Spoonhoward was required to safely secure the firearm at all times, whether he was on- or off-duty.  See Complaint ¶¶ 31-32, at 5-6.  The policy provides:

---

[2]AMCO Insurance is a citizen of Iowa, which is both its state of incorporation and its principal place of business.  See Notice of Removal ¶ 15, at 4, filed April 29, 2014 (Doc. 1).

When not secured on the officer's person or other department approved locking storage device or locked truck of an issued service vehicle, officers are to ensure that their service weapon is secured and/or stored in a safe manner; and

The service weapon shall be secured so as to be inaccessible to children or unauthorized personnel at all times.

Complaint ¶ 32, at 6 (quotation unattributed).

Trujillo was able to get his hands on this pistol, and, on July 8, 2010, he had his girlfriend arrange a meeting at the Santa Fe Place Mall between him and C. Aguayo.  See Complaint ¶ 12, at 3.  Trujillo was angry at C. Aguayo about cellular telephone communications that C. Aguayo had engaged in with Trujillo's girlfriend, and, when C. Aguayo arrived at the mall, Trujillo drove up to him, got out of the car, and shot him four or five times with the pistol.  See Complaint ¶¶ 13-18, at 3.  C. Aguayo collapsed to the ground, and Trujillo walked up to within three feet of him and emptied the rest of the gun's magazine into C. Aguayo.  See Complaint ¶ 18, at 3.  Trujillo and his girlfriend fled the scene, but Trujillo was picked up by police less than an hour after the shooting.  See Complaint ¶ 19, at 3; id. ¶ 22, at 4.  Immediately upon apprehension, Trujillo told police that he "ha[d] to tell you guys I got the gun from my dad[;] he's a state cop." Complaint ¶ 23, at 4.

C. Aguayo was bleeding, and slipping in and out of consciousness, when officers arrived at the scene.  See Complaint ¶ 20, at 3.  He was in great pain and at one point asked officers to shoot him to end his suffering.  See Complaint ¶ 20, at 4.  Officers rushed him to the hospital, but, shortly after his arrival, he succumbed to his injuries and died.  See Complaint ¶ 21, at 4.

At the time C. Aguayo was murdered, the Aguayo family had an AMCO Insurance policy that provided them with uninsured motorist benefits.  See Complaint ¶ 60, at 9.  Because Trujillo used a vehicle in his commission of the crime, the Aguayo family submitted an insurance claim for the full amount of the policy limit.  See Complaint ¶ 62, at 9.  AMCO Insurance denied the

claim without interviewing any witnesses or speaking with the Aguayo family.  See Complaint ¶¶ 63-64, at 9-10.

## PROCEDURAL BACKGROUND

This case involves the Plaintiffs' Motion to remand the case to state court after AMCO Insurance removed it to federal court, arguing that, because the case was pending in state court "more than 1 year," AMCO Insurance's removal was improper.  28 U.S.C. § 1446(c)(1).  AMCO Insurance, for its part, contends that removal was justified under the recently passed bad-faith exception to the one-year limitation, which requires that the Plaintiffs' actions in state court were "in bad faith in order to prevent a defendant from removing the action."  28 U.S.C. § 1446(c)(1). As such, the relevant background to the resolution of this Motion are the parties' procedural actions while litigating this case in state court.  The parties vary widely in the motives they ascribe to their own and each other's actions; the objective facts of how the litigation unfolded, however, are not in dispute.

### 1.    The Plaintiffs File Their Case in State Court.

The Plaintiffs -- C. Aguayo's family members and his personal representative -- first filed suit in state court on May 24, 2012, naming Trujillo, Spoonhoward, the NMDPS, and the State of New Mexico as Defendants.  See Complaint for Damages, filed in state court May 24, 2012, filed in federal court April 29, 2014 (Doc. 1-1).  The Plaintiffs then filed an Amended Complaint for Damages, filed in state court November 18, 2012, filed in federal court April 29, 2014 (Doc. 1-2), which additionally alleged one claim against AMCO Insurance -- for a declaratory judgment that AMCO Insurance is obligated to "pay the full measure of any judgment obtained against it."  Amended Complaint for Damages ¶ 60, at 9.  See Amended Complaint for Damages ¶¶ 50-60, at 8-9.   On November 18, 2013 -- exactly one year after naming AMCO

- 5 -

Insurance -- the Plaintiffs dismissed Spoonhoward from the case, and on December 5, 2013, the Plaintiffs dismissed the State of New Mexico and the NMDPS from the case.  See Stipulation of Dismissal with Prejudice of All Claims Against New Mexico Department of Public Safety and State of New Mexico at 1, filed in state court December 5, 2013, filed in federal court April 29, 2014 (Doc. 1-3)("All claims against Defendant Trace Spoonhoward previously were dismissed with prejudice, by stipulation filed November 18, 2013.").  On December 6, 2013, the Plaintiffs filed their most recent version of the Complaint, which names only Trujillo and AMCO Insurance.  See Complaint ¶ 56-84, at 9-12.  The Complaint alleges two new claims against AMCO Insurance: "bad faith" and "violations of the insurance code."  Complaint ¶¶ 70-84, at 10-12 (capitalization altered).  On April 25, 2014 -- six days before the case was set to go to trial in state court -- the Plaintiffs dismissed Trujillo from the case, leaving AMCO Insurance as the only Defendant.  See Notice of Dismissal, filed in state court April 25, 2014, filed in federal court April 29, 2014 (Doc. 1-11); Notice of Removal ¶ 11, at 3, filed April 29, 2014 (Doc. 1).

Through all of these filings, the Plaintiffs avoided pleading a specific dollar amount of damages sought.  See, e.g., Notice of Removal ¶ 10, at 3.  According to an affidavit to which AMCO Insurance's attorney swore, the Plaintiffs served AMCO Insurance with an offer of settlement on April 22, 2014, offering to dismiss the case.  See Attorney's Affidavit ¶ 4, at 1, filed April 29, 2014 (Doc. 1-5); N.M. Civ. P. 1-068 (providing that parties may make offers of settlement, which are similar to offers of judgment in the federal system, see Fed. R. Civ. P. 68).  AMCO Insurance's attorney states that she cannot provide a copy of the offer of settlement or disclose the exact amount involved, but that it is greater than $225,000.00.  See Attorney's Affidavit ¶ 4, at 1 (citing N.M.R. Evid. 11-408 (providing that offers of settlement cannot be used as evidence)).

2.      __AMCO Insurance Removes the Case to Federal Court.__

On April 29, 2014, two days before the case was set to go to trial in state court, AMCO Insurance removed the case to federal court.  <u>See</u> Notice of Removal at 1.  It asserts diversity jurisdiction, noting that, once Trujillo was dismissed, there is complete diversity between the Plaintiffs -- all New Mexico citizens -- and AMCO Insurance, an Iowa citizen.  <u>See</u> Notice of Removal ¶ 12, at 3; <u>id.</u> ¶¶ 13-15, at 4.  <u>See also</u> note 2, <u>supra</u>, at 3.  It further asserts that it has met its burden in proving satisfaction of the amount-in-controversy requirement by pointing to the offer of judgment, in which the Plaintiffs seek more than $75,000.00 in damages.  <u>See</u> Notice of Removal ¶¶ 18-19, at 5 (citing <u>McPhail v. Deere & Co.</u>, 529 F.3d 947, 956 (10th Cir. 2008))("Documents that demonstrate a plaintiff's own estimation of the claim's value are a proper means of supporting the allegations in the notice of removal.").

Rather than wait for the inevitable motion to remand, AMCO Insurance preemptively addresses the timeliness of its removal.  <u>See</u> Notice of Removal ¶12, at 3-4; <u>id.</u> ¶¶ 16-17, at 4-5; <u>id.</u> ¶¶ 20-39, at 5-10.  It acknowledges that "removal must ordinarily be sought . . . within one year of the initiation of the action," but contends "th[at] requirement[] do[es] not apply where the plaintiffs have acted in bad faith in order to prevent removal."  Notice of Removal ¶ 12, at 3-4 (citing 28 U.S.C. § 1446(c)(1)).  AMCO Insurance alleges that the "Plaintiffs have employed a variety of procedural machinations in order to thwart removal" in light of the complete-diversity requirement.  <u>See</u> Notice of Removal ¶ 12, at 4.

AMCO Insurance's argument is that: (i) the claims against Spoonhoward, NMDPS, and the State of New Mexico never had anything to do with AMCO Insurance, and, therefore, only Trujillo's presence in the case made AMCO Insurance a proper party; and (ii) the Plaintiffs kept Trujillo in the case for over a year, never intending to take him to trial, for the purpose of

defeating complete diversity and keeping the case in state court.  As to the first part of its two-part argument, AMCO Insurance essentially just asserts it to be true:

> Plaintiffs' claims against Defendants Spoonhoward, NMDPS and the State were unrelated to any claims against AMCO.
>
> . . . .
>
> Plaintiffs' claims against Defendants Spoonhoward, NMDPS and the State would have been subject to dismissal under the doctrine of fraudulent joinder, had claims against Defendant Trujillo not already been pending.  <u>See</u> <u>Salisbury v. Purdue Pharma, LP</u>, 166 F. Supp. 2d 546, 548 (E.D. Ky. 2001)(fraudulent joinder is applicable "when the plaintiff joins a defendant who has no joint, several, or alternative liability with a diverse defendant (and there is no nexus between the claims against the diverse and non-diverse defendant)" (citation omitted)).

Notice of Removal ¶ 21, at 6 & n.2.

As to the second part, AMCO Insurance points to evidence that it says provides circumstantial proof of the Plaintiffs' intent, including that the Plaintiffs were lethargic in pursuing their claims against Trujillo throughout the case's lifespan and that the Plaintiffs continually hid the ball with regard to the amount of damages sought.  AMCO Insurance notes that the Plaintiffs failed to serve a summons on Trujillo until September 11, 2012, and attaches an exhibit proving the date of service.  <u>See</u> Notice of Removal ¶ 24, at 6; Summons to Michael Trujillo at 2, filed in state court September 14, 2014, filed in federal court April 29, 2014 (Doc. 1-12).  It also notes that Trujillo was required to file an answer to the Complaint within thirty days of the Complaint's filing -- which he still has not done; that the Plaintiffs were entitled to a default judgment against Trujillo as early as October 12, 2012; and that the Plaintiffs did not seek a default judgment until April 9, 2014.  <u>See</u> Notice of Removal ¶¶ 23, 25-26, at 6.  <u>See also</u> Motion for Default Judgment, filed in state court April 9, 2014, filed in federal court April 29, 2014 (Doc. 1-9).  AMCO Insurance further notes that the Plaintiffs never sought written discovery on Trujillo, nor did they inquire about his assets.  <u>See</u> Notice of Removal

¶¶ 27-28, at 6-7.  Most obviously, AMCO Insurance points to the Plaintiffs' voluntary dismissing

Trujillo from the case six days before trial.  See Notice of Removal ¶ 30, at 7.

AMCO Insurance argues that, "[w]ith its amendment effective January 6, 2012,

28 U.S.C. § 1446(c)(1) now recognizes the right of a defendant to remove an action kept out of

federal court for more than one year by bad-faith conduct of plaintiffs," and that "[t]he comments

to the amendment indicate that it is intended to apply in circumstances such as those at bar."

Notice of Removal ¶¶ 33-34, at 8.  It asserts that, because of the amendment's recentness, "there

is a dearth of circuit-level authority construing the scope of 'bad faith,'" but it cites to a district

court opinion, Lawson v. Parker Hannifin Corp., No. CIV 13-0923 O, 2014 WL 1158880 (N.D.

Tex. Mar. 20, 2014)(O'Connor, J.), which AMCO Insurance says supports its argument.

> [T]he court found sufficient ground to apply the "bad-faith" exception to the one-year rule where the plaintiff "did not take a default judgment against Hanlon [the nondiverse defendant] when he failed to timely file an answer in the State Court action . . . , never served Hanlon with any discovery, . . . non-suited Hanlon approximately one year and three months following the expiration of the one-year removal deadline . . . [did not require] Hanlon to pay any money to Plaintiff to settle her allegedly egregious claim against him [and] took her nonsuit against Hanlon less than five weeks before the existing trial date." Lawson, at *5 (citing Shiver v. Sprintcom, Inc., 167 F. Supp. 2d 962, 963 (S.D. Tex. 2001) to show that, even before the amendment to 28 U.S.C. § 1446(c)(l), a federal court would refuse to remand where the defendant removed the case outside one-year period when the plaintiff dismissed the only nondiverse defendant on the eve of trial).

See Notice of Removal ¶ 36, at 8-9.  AMCO Insurance criticizes the "Plaintiffs' stated

justification for dismissing Trujillo," arguing that, in reality, the Plaintiffs dismissed him from

the case because he is judgment-proof.  See Notice of Removal ¶ 37, at 9.  AMCO Insurance

asserts that the Plaintiffs knew from the inception of the case that Trujillo is incarcerated for

murder and is extremely unlikely to have assets worth suing to collect.  See Notice of Removal

¶ 37, at 9.  AMCO Insurance concludes its Notice of Removal by setting forth that it has

complied with all the formalities of the removal procedure.  See Notice of Removal ¶¶ 40-44, at 10-11.

### 3. <u>The Parties Submit Their Briefing on the Motion</u>.

Within a month of removal, the Plaintiffs filed their Motion to remand the case back to state court.  See Motion at 1.  The Plaintiffs first contend that "there is a presumption against removal," Motion at 10 (citing <u>Laughlin v. Kmart Corp.</u>, 50 F.3d 871, 873 (10th Cir. 1995)), which "requires a federal court 'to . . . narrowly construe removal statutes,'" Motion at 10 (omission in original)(quoting <u>Pritchett v. Office Depot, Inc.</u>, 420 F.3d 1090, 1095 (10th Cir. 2005)).  They then move to their substantive arguments, first contending that -- even putting Trujillo aside -- each of the State Defendants would, on their own, suffice to defeat complete diversity.  <u>See</u> Motion at 11-15.   Here, the Court suspects that the Plaintiffs have misapprehended AMCO Insurance's argument.  They argue strenuously that their naming of State Defendants was not done in bad faith, nor was it done to defeat diversity.  <u>See</u> Motion at 11-15.  To their credit, they present strong evidence to this effect, noting that each of the State Defendants settled out of the case -- and were not merely dismissed as the Notice of Removal suggests.  <u>See</u> Motion at 12.  AMCO Insurance never argues, however, that the State Defendants were named in bad faith; rather, its argument is that, were Trujillo not named in the suit, the Plaintiffs would have no basis for joining AMCO Insurance.  <u>See</u> Notice of Removal ¶ 21, at 6 & n.2.  The Plaintiffs address this argument, as well, albeit secondarily:

> Recognizing that it cannot make a valid claim that the Aguayos somehow manipulated the State defendants to defeat diversity, AMCO drops a footnote arguing that the Aguayos['] claims against the State defendants "would have been subject to dismissal under the doctrine of fraudulent joinder had claims against Defendant Trujillo not already been pending."  Notice of Removal ¶ 21, at 6 n.2. This is not so.  As this Court has recognized, the standard for fraudulent joinder is "whether the defendant has demonstrated that there is no possibility that the plaintiff will recover against an in-state defendant."  <u>Flores-Duenas v. Briones</u>,

- 10 -

No. CIV 13-0660 JB/CG, 2013 WL 6503537, at *22 (D.N.M. Dec. 1, 2013)(Browning, J.).  The burden is on AMCO to make this showing.  Ullman v. Safeway Ins. Co., No. CIV 13-0595 JB/RHS, 2013 WL 7141522, at *24 (D.N.M. Dec. 31, 2013)(Browning, J.)("The party asserting fraudulent joinder bears the burden of proof."  (citations omitted)).  This burden is a heavy one and presents a high hurdle to the party making the assertion.  Dutcher v. Matheson, 733 F.3d 980 (10th Cir. 2013); Ullman, 2013 U.S. Dist. LEXIS 184761, at *83 (citing Montano v. Allstate Indemnity Co., 2000 U.S. App. LEXIS 6852, at *1 (10th Cir. 2000)("The case law places a heavy burden on the party asserting fraudulent joinder.").  The analysis turns on "whether there is a reasonable basis to believe the plaintiff might succeed in at least one claim against the non-diverse defendant."  Nerad v. AstraZeneca Pharms., Inc., 203 F. App'x 911, 913 (10th Cir. 2006).

Motion at 14.

The Plaintiffs also counter AMCO Insurance's contention that it joined Trujillo in bad faith.  See Motion at 15-18.  They note that AMCO Insurance's assertion that they did not take written discovery, while true, ignores the fact that they deposed him -- in fact, Trujillo initially asserted privilege, the Plaintiffs obtained a court order compelling testimony, and then they deposed him a second time.  See Motion at 16 (citing Order Granting Plaintiffs' Motion to Compel Deposition Testimony and Denying Michael Trujillo's Motion for Protective Order, filed in state court November 27, 2013, filed in federal court May 16, 2014 (Doc. 11-15, at 38-39)).  The Plaintiffs assert that "there was little need for extensive discovery as to Mr. Trujillo's conduct, because there is no dispute that he killed Christopher Aguayo."  Motion at 16.  The Plaintiffs explain their delay in serving Trujillo by contending that they could not locate where he was incarcerated while awaiting his criminal trial.  See Motion at 17.  They assert that they attended his sentencing hearing, where they learned that he would serve his time at the juvenile detention center in Albuquerque, New Mexico.  See Motion at 17.  Last, they address their reasons for dismissing Trujillo from the case: "That decision was recognition of the fact that Mr. Trujillo was not going to be able to pay any judgment obtained, . . . that chasing . . . Chris's

murderer for the rest of their lives to extract money would be an exercise in futility . . . [, and] continued contact with Mr. Trujillo was likely to prolong the grief associated with Chris's death." Motion at 18. They also state that the death of Trujillo's sister played a role in their decision, as they did not wish to "us[e the] litigation to try and punish Mr. Trujillo or his family." Motion at 18.

The Plaintiffs also counter AMCO Insurance's contention that it was not aware that the amount in controversy exceeded the jurisdictional minimum until the Plaintiffs sent their offer of settlement. See Motion at 18-19. They assert that "[o]n October 16, 2013 . . . the Aguayos had told AMCO it would take multiples of the policy limits at issue to settle this case, and that[,] if mediation were to be productive[,] an 'opening offer' of policy limits would be required." Motion at 19. They argue that "[s]ection 1446(b)(3) provides that 'notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case in one which is or has become removable," and that several months passed between AMCO Insurance gaining this knowledge and it filing removal. Motion at 19. The Plaintiffs conclude their Motion by requesting fees and costs associated with filing the "objectively unreasonable" removal. Motion at 20-21 (citing 28 U.S.C. § 1447(c)).

AMCO Insurance responded to the Motion less than two weeks later. See Defendant's Response to Plaintiff's Motion to Remand, filed June 10, 2014 (Doc. 15)("Response"). After some unusually colorful opening language, AMCO Insurance characterized the statutory bad-faith exception to the one-year removal rule: "The amendment standardized an inconsistency among circuits, as the majority already applied an equitable exception to the one-year requirement and allowed removal after a year where plaintiffs had acted in bad faith to defeat

- 12 -

diversity."   Response at 2 (citing Wilson v. Gen. Motors Corp., 888 F.2d 779, 781 (11th Cir.

1989); Barnett v. Sylacauga Autoplex, 973 F. Supp. 1358 (N.D. Ala. 1997); Kinabrew v. Emco-

Wheaton, Inc., 936 F. Supp. 351, 351 nn.1-2 (M.D. La. 1996)).   It asserts that the amendment

represents "a legislative recognition that '[s]trict application of the one-year limit would

encourage plaintiffs to join nondiverse defendants for 366 days simply to avoid federal court,

thereby undermining the very purpose of diversity jurisdiction.'"   Response at 2 (alteration in

Response)(quoting Tedford v. Warner-Lambert Co., 327 F.3d 423, 427 (5th Cir.

2003)("Tedford")).   AMCO Insurance also contends that, whatever bad faith means in this

context, it cannot be the case that the Court must rely on the Plaintiffs' own representation about

the purposes behind their actions.  See Response at 4 & n.1 (citing Forth v. Diversey Corp., No.

CIV 13-0808 A, 2013 WL 6096528, at *3 (W.D.N.Y. Nov. 20, 2013)("Since it would be

extraordinary for a party directly to admit a 'bad faith' intention, his motive must of necessity be

ascertained from circumstantial evidence.")).

   AMCO Insurance also attempts to distinguish what it says is the Plaintiffs'

characterization of its removal argument -- that Trujillo was never a proper party to the

case -- from its actual argument -- that Trujillo was improperly maintained as a party all the way

until immediately before trial.  See Response at 4.  AMCO Insurance contends that, "[i]n the

roughly one page in which Plaintiffs acknowledge in any way the length of time they kept

Trujillo in the case, they provide supposed reasons for *dismissing* their claims against Trujillo,

but they provide no reason whatsoever for their *failure to dismiss* those claims until the eve of

trial."   Response at 4 (emphasis in original).   AMCO Insurance asserts that the Plaintiffs'

contention that they only realized that it would be unprofitable to take Trujillo to trial six days

before the trial "strains credulity to the breaking point."  Response at 5.  AMCO Insurance makes

a similar argument with regard to the various emotional reasons that the Plaintiffs give for dismissing Trujillo, questioning why these reasons failed to induce them to dismiss Trujillo until the very last minute before trial.  See Response at 5.

AMCO Insurance also argues that the dismissals of the State Defendants were "suspiciously timed."  Response at 8 (emphasis omitted)(capitalization altered).  They highlight that the Plaintiffs dismissed Spoonhoward exactly one year following their joinder of AMCO Insurance and that they dismissed the other State Defendants the day before amending their complaint to seek money damages against AMCO Insurance.  See Response at 8.  AMCO Insurance concedes that the State Defendants settled out of the case, but asserts that "the settlement was reached October 2013, approximately *six weeks before* the dismissals were completed."  Response at 9 (emphasis in original).  AMCO Insurance states that, "[w]hile it is not unheard-of that post-mediation negotiations can take a month or more, Plaintiffs cannot credibly deny that the timing of the dismissals is nonetheless dubious."  Response at 9.

The Plaintiffs replied to the Response less than three weeks later.  See Plaintiffs' Reply in Support of Their Motion to Remand, filed June 27, 2014 (Doc. 23)("Reply").  They first address AMCO Insurance's contention that there was suspicious delay between when the Plaintiffs reached a settlement agreement with the State Defendants and when the State Defendants were dismissed from the case.  See Response at 3.  The Plaintiffs assert that "it was the State defendants' counsel, Mr. [Michael] Dickman, and not the Aguayos' counsel, that drafted and filed each of the dismissals."  Response at 3 (footnote omitted).  The Plaintiffs contend that this distinction is important, because, once one knows that it was the State Defendants who drafted and filed the dismissals, it becomes clear that the Plaintiffs could not have been delaying their dismissal absent a conspiracy.  See Response at 3.

The Plaintiffs next defend their contention that they did not initiate or maintain their action against Trujillo in an attempt to defeat diversity.  See Response at 6-8.  They argue that there is no reason "why the Aguayos would retain a damages expert **after** AMCO was added as a party to this case if they did not intend to pursue their claims against Mr. Trujillo."  Response at 6 (emphasis in original)(citing Plaintiff John Aguayo Sr.'s Third Supplemental Responses and Objections to Defendant AMCO Insurance Company's Interrogatories and Requests for Production, filed June, 27, 2014 (Doc. 23)).  The Plaintiff assert that

> AMCO is inconsistent in presenting its false accusations.  For example, in addressing the commonsense notion that if the Aguayos had not intended to seek damages against Mr. Trujillo there would have been no need to name him as a party, AMCO[] states "Trujillo was a teenager incarcerated for murder; Plaintiffs could never have viewed him as a viable source of recovery."  Response at 5.  However, only one page later in its response AMCO chastises the Aguayos for failing to inquire as to Mr. Trujillo's ability to pay a judgment.  Response at 6-7.  Similarly, AMCO argues that the initial identification of Mr. Trujillo as a party to this matter is immaterial because "the central thrust" of its notice of removal is "not that Plaintiffs improperly sued Trujillo in the first instance; AMCO's point is that Plaintiffs maintained their claims against Trujillo until the eleventh hour."  Response at 4.  Yet, AMCO subsequently argues that the Aguayos inclusion of Mr. Trujillo as a party was done with the intent "to defeat federal diversity jurisdiction once they named their insurer as a defendant."  Response at 5.

Response at 7 n.3.

The Plaintiffs do not set forth the appropriate legal standard for the Court to apply, but they distinguish AMCO Insurance's cases.  See Response at 9-11.  They argue that Lawson v. Parker Hannifin Corp., the case upon which AMCO Insurance relies most heavily, is distinguishable, because in that case, the plaintiff "promised the court in a verified motion that she would diligently prosecute her action, but took no steps to move the case forward."  Reply at 10.  They contend that Forth v. Diversey is distinguishable for similar reasons:

> There, the district court found compelling the plaintiff's unfulfilled promise to dismiss a defendant he knew was not a proper party.  The court noted that the plaintiff's explanation for reneging on his commitment was that the plaintiff

claimed he needed more discovery, but that the plaintiff refused the defendant's offer to sit for a deposition.

Reply at 10.

### 4.      The Court Holds a Hearing on the Motion.

The Court held its hearing on August 7, 2014. See Transcript of Hearing (taken August 7, 2014)("Tr.").[3]  The Court began the hearing by noting that it had been faced with a similar motion to remand -- relying on the new bad-faith exception in 28 U.S.C. § 1446(c)(1) -- in Peshlakai v. Ruiz, No. CIV 13-0752 JB/ACT (D.N.M. 2013)(Browning, J.).  See Tr. at 2:3-19 (Court).  The Court noted that, although in that case the plaintiffs ultimately decided to withdraw their motion to remand and try their case in front of the Court, it had some experience wrestling with the statute's meaning, and it would take some work to ascertain what Congress meant for the exception's scope to be.[4]  See Tr. at 2:15-3:23 (Court).

The parties kept their presentations brief.  AMCO Insurance stated that its argument focuses on the "plain text of the statute[,] which requires an intent by the plaintiffs to try and . . . defeat diversity jurisdiction."  Tr. at 4:16-18 (Garcia).  The Court asked how it could give content to the bad-faith exception and "still somewhat respect the plaintiff's ability to be master of his or her complaint and where they want to litigate the case."  Tr. at 6:4-8 (Court). AMCO Insurance acknowledged that "it is generally correct that plaintiffs try to stay out of Federal Court," Tr. at 6:10-11 (Garcia), but that the test should be "whether there was any

---

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[4]The Court has looked at the Peshlakai v. Ruiz briefing and hearing transcript for additional help in interpreting § 1446(c)(1).  The Court noted that it would do so at the hearing in this case. See Tr. at 3:4-7 (Court)("I didn't see that sort of briefing . . . here so I went back and I have been going through the transcripts and the briefing in that case . . . .").  The Court did not issue a ruling or opinion on the motion to remand in that case, but the briefing remains available on CM/ECF.

motivation . . . more than just this generalized desire . . . to stay out of Federal Court," Tr. at 6:19-21 (Court).

The Court noted that, when it addressed the issue in <u>Peshlakai v. Ruiz</u>, "not a single district court had interpreted this" statutory exception.   Tr. at 6:25-7:1 (Court).   AMCO Insurance first contended that, regardless of the proper substantive standard, the Court should use a preponderance of the evidence standard to evaluate the evidence of bad faith.  <u>See</u> Tr. at 7:5-14 (Garcia).  It noted, however, that at least one court had applied a clear-and-convincing standard to the question of bad faith.   <u>See</u> Tr. at 7:17-20 (Garcia)(referring to <u>Forth v. Diversey Corp.</u>, 2013 WL 6096528).

The Plaintiffs elaborated on their assertion in the Reply that the delay in dismissing the State Defendants was attributable to the State Defendants.   <u>See</u> Tr. 10:22-14:4 (Garcia, Court). The Plaintiffs stated that the dismissal was entered as soon as the State Defendants produced the settlement check.   <u>See</u> Tr. at 14:1-4 (Garcia).   The Plaintiffs also noted that Trujillo had counsel, and that Trujillo's counsel and mother contributed to the delay in seeking discovery from and ultimately dismissing Trujillo.   <u>See</u> Tr. at 15:14-25 (Garcia).   The Plaintiffs also reiterated that they were in no rush to seek discovery from Trujillo, both because he was incarcerated and because "[t]here was no dispute as to liability."   Tr. at 15:22-25 (Garcia).   The Plaintiffs repeated their assertions that they deposed Trujillo twice -- because he invoked the Fifth Amendment to the Constitution of the United States on their first attempt to depose him -- and that he did not oppose a default motion filed against him.   <u>See</u> Tr. at 17:21-25 (Garcia).   Last, the Plaintiffs asserted that dismissing defendants on the eve of trial is standard issue narrowing and does not reflect an intent to circumvent federal jurisdiction.   <u>See</u> Tr. at 19:2-7 (Garcia)("I don't think

that's unusual.  Every trial I've been involved with people pa[re] down their cases, claims, et cetera, in order to have a streamlined trial.").

AMCO Insurance argued that, in its view, the statute is not "talking about unethical conduct" when it refers to bad faith.  Tr. at 21:22-24 (Wesner).  AMCO Insurance stated that it had looked at the amendment's legislative history and that it indicates that Congress intended the bad-faith exception to be a codification of the equitable exception that had developed in the case law before the amendment's passage.  See Tr. at 22:21-23:16 (Wesner, Court).  The Court asked whether there was "any problem with naming Trujillo" in the first instance, and AMCO Insurance answered that there was not.  Tr. at 25:7-10 (Court, Wesner).  AMCO Insurance then argued:

> There are two points in the time line I think where that becomes relevant. First is when they've let out the other state defendants and this becomes a case clearly where they're looking to Amco for their recovery.  At that point there was no articulable reason to keep Trujillo in the case they knew he had no assets they knew they were looking for Amco for all their recovery and the only reason that makes any sense to keep him in the case at that point was to stay out of Federal Court.

Tr. at 26:5-14 (Wesner).  AMCO Insurance also clarified that it could not remove the action earlier than it did, because, unlike fraudulent joinder, the bad-faith exception is an exception only to the one-year limitation, and not to complete diversity -- meaning that it could not remove the case until Trujillo was dismissed.  See Tr. at 28:19-30:23 (Wesner, Court).  The Court accepted this explanation.  See Tr. at 30:21-25 (Wesner, Court)("MR. WESNER: I'm not aware of a doctrine on which you can argue bad faith keeping a defendant in the case who is still in the case. THE COURT: You may be right.  You may be right.").

AMCO Insurance concluded by summarizing its argument:

THE COURT:        All right.  What is your bad faith argument?  Is it I guess just the dismissal of Mr. Trujillo and the timing of it or is it also the delay in the dismissal of the stipulations as to the state defendants[?]

MR. WESNER:        We raised a couple other factors in the briefing.  We raised the timing of their dismissal of the state defendants The first amended complaint against A[MCO], in which they first brought A[MCO] in the case was November 18, 2012.  Their dismissal of defendant Spoonhoward was November 18, 2013.  Now, we can't read their minds.  [W]e know all we have to go on in these cases is circumstantial evidence . . . .  The Court in [Forth v. Diversey Corp.] noted that it would be extraordinary for a party directly to admit a bad faith intention.  His motive must of necessity be ascertained from circumstantial evidence.  And for while we think the center piece of our argument removing this case to federal court is that they kept Michael Trujillo in the case knowing that they couldn't recover anything against him right up until the [e]ve of trial.  We think there is other circumstantial evidence that the plaintiffs wanted to keep this case out of federal [c]ourt.  They did let the state defendants out with some . . . suspicious timing.  Another element is failure to disclose the amount in controversy and it's come up in the briefing that we had every reason to suspect that the plaintiffs were seeking more than if the jurisdictional amount in controversy and that's true, we did suspect that but they didn't unequivocally state the amount they were seeking until their offer of judgment, which was not until April 22, before a May 5th trial date.   Up until then we served discovery, plaintiffs responded to discovery on April 1st and refused to identify the amount they were seeking.  So the amount in controversy, the timing of the state defendant dismissals, that's circumstantial evidence.  But the real clincher, the point and I think the one factor that would stand alone without any shenanigans with the amount in controversy without any suspicious timing on the state dismissals we would still be having these arguments just because they kept Michael Trujillo in the case without [--]

THE COURT:        So that's the big issue for you[?]

MR. WESNER:        Yes, it is, Your Honor.

Tr. at 31:12-33:10 (Court, Wesner).

The Court stated that it was not prepared to rule from the bench, as it wanted to flesh out the meaning of bad faith before applying it; the Court also noted that, however it ended up defining the exception, it doubted that this case would qualify for the exception, and, thus, it was likely to remand the case.  See Tr. at 44:20-45:17 (Court).

## LAW REGARDING DIVERSITY JURISDICTION

"Subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) requires: (i) complete diversity among the parties; and (ii) that 'the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.'"[5]   Thompson v. Intel Corp., No. CIV 12-0620 JB/LFG, 2012

---

[5]The Constitution permits -- but does not mandate -- Congress to authorize an even broader scope of federal subject-matter jurisdiction than Congress has chosen to enact: "The judicial power shall extend to all cases, in law and equity, . . . between citizens of different states."  U.S. Const. art. III, § 2, cl. 1.  This clause permits federal jurisdiction: (i) in cases with minimum diversity -- those in which any one party is a citizen of a different state than any opposing party -- in addition to cases with complete diversity; and (ii) in cases in which the amount in controversy is below the statutory amount-in-controversy requirement.  See State Farm Fire & Cas. v. Tashire, 386 U.S. 523 (1967).
    For the federal courts to have jurisdiction over a matter, however, jurisdiction must be both constitutionally empowered and congressionally authorized.  As the Honorable John J. Sirica, then-Chief United States District Judge for the District of Columbia, put it:

> For the federal courts, jurisdiction is not automatic and cannot be presumed. Thus, the presumption in each instance is that a federal court lacks jurisdiction until it can be shown that a specific grant of jurisdiction applies.  Federal courts may exercise only that judicial power provided by the Constitution in Article III and conferred by Congress.  All other judicial power or jurisdiction is reserved to the states.  And although plaintiffs may urge otherwise, it seems settled that federal courts may assume only that portion of the Article III judicial power which Congress, by statute, entrusts to them.  Simply stated, Congress may impart as much or as little of the judicial power as it deems appropriate and the Judiciary may not thereafter on its own motion recur to the Article III storehouse for additional jurisdiction.  When it comes to jurisdiction of the federal courts, truly, to paraphrase the scripture, the Congress giveth, and the Congress taketh away.

Senate Select Comm. on Pres. Campaign Activities v. Nixon, 366 F. Supp. 51, 55 (D.D.C. 1973)(footnotes omitted).  The complete-diversity and amount-in-controversy requirements are two ways in which Congress has authorized a narrower scope of subject-matter jurisdiction than the full measure that the Constitution permits.  Congress has similarly narrowed federal-question jurisdiction.  Congress may authorize federal "arising under" jurisdiction over all cases in which "the constitution[] forms an ingredient of the original cause" of action, U.S. Const. art. III, § 2, cl. 1 ("The judicial power shall extend to all cases, in law and equity, arising under this Constitution . . . .").

> We think, then, that when a question to which the judicial power of the Union is extended by the constitution, forms an ingredient of the original cause, it is in the

WL 3860748, at *12 (D.N.M. Aug. 27, 2012)(Browning, J.)(citing 28 U.S.C. § 1332(a)).  As the Court has previously explained, "[t]he Supreme Court of the United States has described this statutory diversity requirement as 'complete diversity,' and it is present only when no party on one side of a dispute shares citizenship with any party on the other side of a dispute."  McEntire v. Kmart Corp., No. CIV 09-0567 JB/LAM, 2010 WL 553443, at *3 (D.N.M. Feb. 9, 2010)(Browning, J.)(citing Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267-68 (1806); McPhail v. Deere & Co., 529 F.3d 947, 951 (10th Cir. 2008)).  The amount-in-controversy requirement is an "estimate of the amount that will be put at issue in the course of the litigation." Valdez v. Metro. Prop. & Cas. Ins. Co., No. CIV 11-0507 JB/KBM, 2012 WL 1132374, at *15 (D.N.M. Mar. 19, 2012)(Browning, J.)(citing McPhail v. Deere & Co., 529 F.3d at 956).  The Court will discuss the two requirements in turn.

    1.    **Diversity of Citizenship.**

    For diversity jurisdiction purposes, citizenship is determined by a person's domicile.  See Crowley v. Glaze, 710 F.2d 676, 678 (10th Cir. 1983).  "A person's domicile is defined as the place in which the party has a residence in fact and an intent to remain indefinitely, as of the time of the filing of the lawsuit."  McEntire v. Kmart Corp., 2010 WL 553443, at *3 (citing Crowley v. Glaze, 710 F.2d at 678).  See Freeport-McMoRan, Inc. v. KN Energy, Inc., 498 U.S. 426, 428 (1991)(holding that diversity jurisdiction is assessed as of the time at which the suit is filed).  If

---

            power of Congress to give the Circuit Courts jurisdiction of that cause, although
            other questions of fact or of law may be involved in it.

Osborn v. Bank of U.S., 22 U.S. 738, 822 (1824)(Marshal, C.J.).  The federal-question jurisdiction statute, however, requires that a substantial, actually disputed question of federal law be present on the face of the well-pleaded complaint, and that its resolution be necessary to the disposition of the claim over which jurisdiction is being asserted.  See 28 U.S.C. § 1331; Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312 (2005); Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149 (1908).

neither a person's residence nor the location where the person has an intent to remain can be established, the person's domicile is that of his or her parents at the time of the person's birth. See Gates v. Comm'r of Internal Revenue, 199 F.2d 291, 294 (10th Cir. 1952)("[T]he law assigns to every child at its birth a domicile of origin.  The domicile of origin which the law attributes to an individual is the domicile of his parents.  It continues until another domicile is lawfully acquired.").  Additionally, "while residence and citizenship are not the same, a person's place of residence is prima facie evidence of his or her citizenship." McEntire v. Kmart Corp., 2010 WL 553443, at *3 (citing State Farm Mut. Auto. Ins. Co. v. Dyer, 19 F.3d 514, 520 (10th Cir. 1994)).  A corporation, on the other hand, is "deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."  Gadlin v. Sybron Int'l Corp., 222 F.3d 797, 799 (10th Cir. 2000)(quoting 28 U.S.C. § 1332(c)(1)).

### 2.     **Amount in Controversy.**

The amount-in-controversy requirement, which presently stands at $75,000.00, must be satisfied as between a single plaintiff and a single defendant for a federal district court to have original jurisdiction over the dispute; "a plaintiff cannot aggregate independent claims against multiple defendants to satisfy the amount-in-controversy requirement," nor can multiple plaintiffs aggregate their claims against a single defendant to exceed the threshold.  Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at *18 (D.N.M. Mar. 30, 2010)(Browning, J.).  If multiple defendants are jointly liable, or jointly and severally liable, on some of the claims, however, the amounts of those claims may be aggregated to satisfy the amount-in-controversy requirement as to all defendants jointly liable for the claims.  See Alberty v. W. Sur. Co., 249 F.2d 537, 538 (10th Cir. 1957); Martinez v. Martinez, 2010 WL 1608884, at *18.  Similarly, multiple plaintiffs may aggregate the amounts of their claims against a single

- 22 -

defendant if the claims are not "separate and distinct." Martin v. Franklin Capital Corp., 251 F.3d 1284, 1292 (10th Cir. 2001)(Seymour, C.J.). Multiple claims by the same plaintiff against the same defendant may be aggregated, even if the claims are entirely unrelated. See 14AA Charles A. Wright, Arthur R. Miller, Edward H. Cooper, Vikram D. Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, Federal Practice and Procedure, Jurisdiction § 3704 (4th ed.). While the rules on aggregation sound complicated, they are not in practice: if a single plaintiff -- regardless whether he or she is the only plaintiff who will share in the recovery -- can recover over $75,000.00 from a single defendant -- regardless whether the defendant has jointly liable co-defendants -- then the court has original jurisdiction over the dispute between that plaintiff and that defendant. The court can then exercise supplemental jurisdiction over other claims and parties that "form part of the same case or controversy under Article III," 28 U.S.C. § 1367(a), meaning that they "derive from a common nucleus or operative fact," United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).

Satisfaction of the amount-in-controversy requirement must be established by a preponderance of the evidence. See McPhail v. Deere & Co., 529 F.3d at 953. In the context of establishing an amount-in-controversy, the defendant seeking removal could appear to be bound by the plaintiff's chosen amount of damages in the complaint, which would seem to allow a plaintiff to avoid federal jurisdiction "merely by declining to allege the jurisdictional amount [in controversy]." McPhail v. Deere & Co., 529 F.3d at 955. The Tenth Circuit's decision in McPhail v. Deere & Co. has foreclosed such an option from a plaintiff who wishes to remain in state court. McPhail v. Deere & Co. holds that a defendant's burden in establishing jurisdictional facts is met if the defendant proves "jurisdictional facts that make it possible that $75,000 is in play." McPhail v. Deere & Co., 529 F.3d at 955.

In McPhail v. Deere & Co., the Tenth Circuit relied on the United States Court of Appeals for the Seventh Circuit's decision in Meridian Securities Insurance Co. v. Sadowski, in which the Honorable Frank H. Easterbrook, United States Circuit Judge, explained how a removing defendant asserting diversity jurisdiction in the face of a silent complaint might proceed:

> [T]he removing defendant, as proponent of federal jurisdiction, must establish what the plaintiff stands to recover.  We have suggested several ways in which this may be done -- by contentions, interrogatories or admissions in state court; by calculation from the complaint's allegations[;] by reference to the plaintiff's informal estimates or settlement demands[;] or by introducing evidence, in the form of affidavits from the defendant's employees or experts, about how much it would cost to satisfy the plaintiff's demands.  The list is not exclusive; any given proponent of federal jurisdiction may find a better way to establish what the controversy between the parties amounts to, and this demonstration may be made from either side's viewpoint (what a judgment would be worth to the plaintiff, or what compliance with an injunction would cost the defendant).  Once the estimate has been made -- and contested factual allegations that support the estimate have been established in a hearing under Rule 12(b)(1) by admissible evidence . . . then . . . the case stays in federal court unless it is legally certain that the controversy is worth less than the jurisdictional minimum.

Meridian Secs. Ins. Co. v. Sadowski, 441 F.3d at 541-42 (citations omitted).  The Tenth Circuit adopted the Seventh Circuit's reasoning, stating:

> Meridian eliminates the double standard that would come from misunderstanding what "preponderance of the evidence" requires.  The proponent of federal jurisdiction must prove contested facts; and because a defendant has no control over the complaint, he cannot put a large sum of money in controversy simply by demanding it, as a plaintiff often can.  But once those underlying facts are proven, a defendant (like a plaintiff) is entitled to stay in federal court unless it is "legally certain" that less than $75,000 is at stake.

McPhail v. Deere & Co., 529 F.3d at 954.  Thus, a defendant removing a matter to federal court has met his or her burden in proving the amount-in-controversy requirement if the defendant has proved any contested facts regarding the amount-in-controversy, and the amount-in-controversy is not legally certain to be less than $75,000.00.

As the Court has previously explained, "[i]n the absence of an explicit demand for more than $75,000.00, the defendant must show how much is in controversy through other means." Salazar v. Geico Ins. Co., No. CIV 10-0118 JB/RLP, 2010 WL 2292930, at *3 (D.N.M. Apr. 27, 2010)(Browning, J.)(citing McPhail v. Deere & Co., 529 F.3d at 955).  The Tenth Circuit has identified the means upon which a defendant may rely to show how much is in controversy: (i) the defendant may rely on an estimate of the potential damages from the allegations in the complaint; (ii) the defendant may rely on other documentation to provide a basis for determining the amount in controversy, such as interrogatories obtained in the state court before removal, affidavits, or other evidence submitted in federal court afterward; and (iii) the defendant may rely on the plaintiff's proposed settlement amount if it appears to reflect a reasonable estimate of the plaintiff's claim, because the plaintiff's own estimation of its claim is a proper means of supporting the allegations in the notice of removal.  See Salazar v. Geico, 2010 WL 2292930, at *3 (citing McPhail v. Deere & Co., 529 F.3d at 956).  In McPhail v. Deere & Co., the Tenth Circuit found that the defendant met its burden to support diversity jurisdiction where the plaintiff's complaint was silent on the amount in controversy.  In its notice of removal, the defendant represented that the amount in controversy exceeded $75,000.00, and incorporated electronic-mail messages and letters of conversations between the parties' attorneys discussing the value of the claim.  The defendant's counsel interpreted the conversation as meaning that the plaintiff was seeking more than $75,000.00, but the plaintiff's counsel refused to concede an amount in controversy in excess of $75,000.00, stating "it may very well be" that the amount in controversy would exceed $75,000.00.  529 F.3d at 957.  The Tenth Circuit found that the background information provided enough supplementary information for the district court to conclude that it was not legally certain that the plaintiff would recover an amount less than

$75,000.00.  See 529 F.3d at 957.  In so ruling, the Tenth Circuit gave the example of a case in which a defendant has allegedly breached a contract and the plaintiff seeks damages in an indeterminate amount.  The Tenth Circuit suggested that "a defendant might support jurisdiction by attaching a copy of the contract, valued at more than $75,000, to the notice of removal."  529 F.3d at 956.

An example of an amount-in-controversy which is not legally certain to reach $75,000.00 is seen in Martin v. Franklin Capital Corp., 251 F.3d 1284 (10th Cir. 2001).  See 251 F.3d at 1291.  In Martin v. Franklin Capital Corp., the defendant's notice of removal totaled up all of the dollar figures in the plaintiff's complaint, but some of the dollar amounts were considered background information that were not linked to the plaintiff's attempts to recover damages.  See 251 F.3d at 1291.  Because the Tenth Circuit found that the defendant's notice of removal depended on an erroneous "construction of the [plaintiff's] pleading," the Tenth Circuit held that the amount-in-controversy requirement was not met.  251 F.3d at 1291.

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Federal courts "possess only that power authorized by [the] Constitution and statute . . . ."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  See 28 U.S.C. §§ 1331-32.  Section 1367 additionally grants the federal courts power to hear claims over which the court lacks original jurisdiction, if those claims are part of

the same constitutional case as claims over which the court has original jurisdiction.   See 28 U.S.C. § 1367(a).

      1.      **Congressional Authority to Exercise Supplemental Jurisdiction.**

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."   Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552.   The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines, pendent jurisdiction and ancillary jurisdiction; § 1367's passage permitted codified those forms of jurisdiction, and additionally courts to also hear cases under pendent-party jurisdiction, which the Supreme Court had previously disallowed in Finley v. United States, 490 U.S. 545 (1989).[6]  Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact."   United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).   Supplemental jurisdiction gives federal courts the flexibility to hear a cause of action after the introduction of third parties, whose insertion into the litigation does not have the support of any independent grounds for federal jurisdiction, when those parties share a common interest in the outcome of the litigation and are logical participants in it.   See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 375 n.18 (1978).

---

[6]The United States Court of Appeals for the Tenth Circuit has noted that Congress' intent in passing 28 U.S.C. § 1367 was to supersede the common-law doctrine of pendent jurisdiction: "Effective December 1, 1990, Congress enacted legislation, codified at 28 U.S.C. § 1367 (1976 & Supp. 1992), which supersedes the common law pendent jurisdiction doctrine."   Baker v. Bd. of Regents of State of Kan., 991 F.2d 628, 634 (10th Cir. 1993)(citing Whalen v. Carter, 954 F.2d 1087, 1097 (5th Cir. 1992); Aschinger v. Columbus Showcase Co., 934 F.2d 1402 (6th Cir. 1991)).

In 1988, the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  See James v. Chavez, No. CIV 09-0540 JB/CG, 2011 WL 6013547, at *5 (D.N.M. Nov. 21, 2011)(Browning, J.)(citing 16 Moore's Federal Practice § 106.04[5] (Matthew Bender 3d ed.)).  In response to the Committee's findings regarding pendent, ancillary, and pendent-party jurisdiction, Congress codified the doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence."  Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

## 2.    The District Courts' Discretion to Exercise Supplemental Jurisdiction.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial

economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction.  383 U.S. at 726.  Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

> (1)     the claim raises a novel or complex issue of State law,
>
> (2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)     the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).   In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity . . . ."  Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164. Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Exec. Software N. Am. v. U.S. Dist. Ct., 24 F.3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087 (9th Cir. 2008); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir.

1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c) . . . .")(emphasis in original); Bonadeo v. Lujan, No. CIV 08-0812 JB/ACT, 2009 WL 1324119, at *8 (D.N.M. Apr. 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists.").  At least one other district court in the Tenth Circuit besides this Court has reached the same conclusion.  See Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should presume to decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)).  This proclamation is consistent with the Supreme Court's statement that

> [n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726 (footnote omitted).  The Court has previously stated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies.  See Armijo v. New Mexico, No. CIV 08-0336 JB/ACT, 2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it.").  The Tenth Circuit

has recognized that a district court does not "abuse [its] discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction.'"  Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).[7]

### LAW REGARDING REMOVAL, REMAND, FRAUDULENT JOINDER, PROCEDURAL MISJOINDER, AND BAD FAITH

If a civil action filed in state court satisfies the requirements for original federal jurisdiction -- meaning, most commonly, federal-question or diversity jurisdiction -- the defendant may invoke 28 U.S.C. § 1441(a) to remove the action to the federal district court "embracing the place where such action is pending."  28 U.S.C. § 1441(a).  See Huffman v. Saul Holdings LP, 194 F.3d 1072, 1076 (10th Cir. 1999)("When a plaintiff files in state court a civil action over which the federal district courts would have original jurisdiction based on diversity of citizenship, the defendant or defendants may remove the action to federal court . . . .")(quoting Caterpillar Inc. v. Lewis, 519 U.S. at 68).  In a case with multiple defendants, there must be

---

[7]Muller v. Culbertson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Muller v. Culbertson, 408 F. App'x 194 (10th Cir. 2011)(unpublished), Brazell v. Waite, 525 F. App'x 878 (10th Cir. 2013)(unpublished), Okla. Farm Bureau Mut. Ins. Co. v. JSSJ Corp., 149 F. App'x 775 (10th Cir. 2005)(unpublished), Nerad v. AstraZeneca Pharms., Inc., 203 F. App'x 911 (10th Cir. 2006)(unpublished), and Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592 (10th Cir. 2000)(unpublished), all have persuasive value with respect to a material issue and will assist the Court in its disposition of this Memorandum Opinion and Order.

unanimous consent to removal; any one defendant may spoil removal and keep the entire case in state court. See 28 U.S.C. § 1446(b)(2)(A). Only true defendants have removal rights: plaintiffs defending counterclaims and third-party defendants may not remove an action,[8] and their consent

---

[8]This view is well-established with regard to plaintiffs defending counterclaims, but is an open question in the Tenth Circuit with regard to third-party plaintiffs. The better view, and the majority view, however, is that "defendants" as used in the removal statute refers to true defendants and not to third-party defendants. As the Court wrote in Wiatt v. State Farm Insurance Co.,

> [w]ith respect to third-party defendants, courts take various views on whether they may remove cases. See NCO Fin. Sys., Inc. v. Yari, 422 F. Supp. 2d 1237, 1239 (D. Colo. 2006)(citing Monmouth-Ocean Collection Serv., Inc. v. Klor, 46 F. Supp. 2d 385 (D.N.J. 1999)). 28 U.S.C. § 1441(a) permits the removal of a civil action of which the district courts of the United States have original jurisdiction "by the defendant or the defendants." The majority view is that third-party defendants are not "defendants" within the meaning of § 1441(a). See First Nat. Bank of Pulaski v. Curry, 301 F.3d 456, 461-62 (6th Cir. 2002); James Wm. Moore, Moore's Federal Practice § 107.11[1][b][iv] ("[T]hird-party defendants are not *defendants* within the meaning of the removal statute." (emphasis in original)). Other justifications for opposing third-party defendant removal are that it would force a plaintiff to litigate in a federal court that he did not choose and to which his adversary originally could not have removed, and that allowing removal would expand jurisdiction of federal courts in contravention of the strictly construed statutory limits on the right to removal. See NCO Fin. Sys., Inc. v. Yari, 422 F. Supp. 2d at 1239. Proponents of third-party removal, however, assert that the term "defendant" under § 1441(a) does not necessarily exclude third-party defendants, who, like other defendants, have been brought into court involuntarily and may have an interest in having a federal forum.

> . . . .

> Sister districts within the United States Court of Appeals for the Tenth Circuit have routinely held that third-party defendants that a defendant/third-party plaintiff impleads may not remove cases. See NCO Fin. Sys., Inc. v. Yari, 422 F. Supp. 2d at 1239-40; Menninger Clinic Inc. v. Schilly, No. CIV 92-4104, 1992 WL 373927, at *1-2 (D. Kan. Nov. 23, 1992); Radio Shack Franchise Dep't v. Williams, 804 F. Supp. at 152-53; Elkhart Co-op Equity Exch. v. Day, 716 F. Supp. 1384, 1385, 1387 (D. Kan. 1989)(cross-claim). These cases, however, involved the application of 28 U.S.C. § 1441(c) and not a plaintiff/counter-defendant impleading the third-party defendant under Rule 14(b). Arguably, some of the rationales for opposing third-party defendant removal may not apply where the plaintiff impleads a third-party defendant, because the plaintiff is the

is not required for removal if all the true defendants consent.  See Hamilton v. Aetna Life & Cas. Co., 5 F.3d 642 (2d Cir. 1993); Wiatt v. State Farm Ins. Co., 560 F. Supp. 2d 1068 (D.N.M. 2007)(Browning, J.).

      To remove a case based on diversity, the diverse defendant must demonstrate that all of the usual prerequisites of diversity jurisdiction are satisfied.  Under 28 U.S.C. § 1332(a), a federal district court possesses original subject-matter jurisdiction over a case when the parties are diverse in citizenship and the amount in controversy exceeds $75,000.00.  See 28 U.S.C. § 1332(a); Johnson v. Rodrigues, 226 F.3d 1103, 1107 (10th Cir. 2000).  Diversity between the parties must be complete.  See Caterpillar Inc. v. Lewis, 519 U.S. at 68; Radil v. Sanborn W. Camps, Inc., 384 F.3d 1220, 1225 (10th Cir. 2004).  In addition to the requirements of original jurisdiction, § 1441(b)(2) lays out the "forum-defendant rule," which provides that a case may not be removed on the basis of diversity jurisdiction if any defendant is a citizen of the state in

---

      party permissively joining the third-party defendant, and in this scenario, the third-party defendant is more like a traditional defendant -- a party antagonistic to the plaintiff.  See Moore, supra, § 107.11 [1][b][iv] ("The better view . . . is that third-party claims are not removable, because only a party defending against claims asserted by a plaintiff ought to be able to remove.").  At least one court, however, has held that a third-party defendant a plaintiff/counter-defendant impleads cannot remove, because the third-party defendant is not a defendant within the meaning of § 1441.  See Garnas v. Am. Farm Equip. Co., 502 F. Supp. 349, 351 n.7 (D.N.D. 1980)(based on pre-1990 amendment to section 1441(c)).

      The Tenth Circuit has not spoken definitively on the propriety of third-party removal.  See NCO Fin. Sys., Inc. v. Yari, 422 F. Supp. 2d at 1240.  It is therefore an open question in this circuit whether a third-party defendant, who the plaintiff impleaded, may remove a case.

560 F. Supp. 2d 1068, 1076 (D.N.M. 2007)(Browning, J.)(citations omitted).  The Court ultimately concluded that it "need not resolve this issue, because assuming, without deciding, that a third-party defendant impleaded under rule 14(b) may attempt removal, Allstate has not met its burden to establish the Court's diversity jurisdiction over the claims against it."  560 F. Supp. 2d at 1078.

which the state-court action was brought.  Brazell v. Waite, 525 F. App'x 878, 884 (10th Cir. 2013)(unpublished)("[W]e note that § 1441(b)(2) -- the so-called forum-defendant rule -- provides as a separate requirement that '[a] civil action otherwise removable solely on the basis of [diversity] jurisdiction . . . may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.'" (alteration in original)(quoting 28 U.S.C. § 1441(b)(2))).  The forum-defendant rule applies only to cases removed under diversity jurisdiction; a defendant may remove a case brought against it in its home state on the basis of federal-question jurisdiction.  See 28 U.S.C. § 1441(b).  Last, a case cannot be removed if it began with a nondiverse party or forum-citizen defendant and only later came to satisfy the requirements of removal jurisdiction, unless: (i) the plaintiff voluntarily dismissed the removal-spoiling party, see DeBry v. Transamerica Corp., 601 F.2d 480, 488 (10th Cir. 1979); Flores-Duenas v. Briones, No. CIV 0660 JB/CG, 2013 WL 6503537, at *12 n.6, *26 (D.N.M. Dec. 1, 2013)(Browning, J.)(describing the operation of the "voluntary-involuntary" rule);[9] or (ii) the removal-spoiling party was fraudulently joined or procedurally misjoined -- doctrines described below.

    1.    **The Presumption Against Removal**.

       Federal courts are courts of limited jurisdiction; thus, there is a presumption against removal jurisdiction, which the defendant seeking removal must overcome.  See Laughlin v.

---

[9]The Tenth Circuit explained:

> The general effect of the [voluntary-involuntary] test is that a cause cannot be removed where the removability is a result of some development other than a voluntary act of plaintiff.  The cause cannot be removed as a result of evidence from the defendant or the result of a court order rendered on the merits of the case.

DeBry v. Transamerica Corp., 601 F.2d at 488 (citation omitted).

Kmart Corp., 50 F.3d 871, 873 (10th Cir. 1995); Fajen v. Found. Reserve Ins. Co., 683 F.2d at

333; Martin v. Franklin Capital Corp., 251 F.3d at 1290; Bonadeo v. Lujan, No. CIV 08-0812

JB/ACT, 2009 WL 1324119, at *4 (D.N.M. Apr. 30, 2009)(Browning, J.)("Removal statutes are

strictly construed, and ambiguities should be resolved in favor of remand.").   The defendant

seeking removal must establish that federal court jurisdiction is proper "by a preponderance of

the evidence."   McPhail v. Deere & Co., 529 F.3d at 953 (10th Cir. 2008).   See Bonadeo v.

Lujan, 2009 WL 1324119, at *4 ("As the removing party, the defendant bears the burden of

proving all jurisdictional facts and of establishing a right to removal.").   Because federal courts

are courts of limited jurisdiction, the Tenth Circuit has ruled that "courts must deny such

jurisdiction if not affirmatively apparent on the record."   Okla. Farm Bureau Mut. Ins. Co. v.

JSSJ Corp., 149 F. App'x 775, 778 (10th Cir. 2005)(unpublished).   On the other hand, this strict

construction and presumption against removal should not be interpreted as a hostility toward

removal cases in the federal courts.   See McEntire v. Kmart Corp., No. CIV 09-0567 JB/LAM,

2010 WL 553443, at *2 (D.N.M. Feb. 9, 2010)(Browning, J.)(citing Bonadeo v. Lujan, 2009 WL

1324119, at *12 ("Strict construction does not mean judicial hostility toward removal.   Congress

provided for removal, and courts should not create rules that are at tension with the statute's

language in the name of strict construction.").

   "It is well-established that statutes conferring jurisdiction upon the federal courts, and

particularly removal statutes, are to be narrowly construed in light of our constitutional role as

limited tribunals."   Pritchett v. Office Depot, Inc., 420 F.3d 1090, 1095 (10th Cir. 2005)(citing

Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-09 (1941); United States ex rel. King v.

Hillcrest Health Ctr., 264 F.3d 1271, 1280 (10th Cir. 2001)).   "All doubts are to be resolved

against removal."   Fajen v. Found. Reserve Ins. Co., 683 F.2d 331, 333 (10th Cir. 1982).   "The

burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction." Montoya v. Chao, 296 F.3d 952, 955 (10th Cir. 2002).

        **2.**        **Procedural Requirements of Removal.**

      Section 1446 of Title 28 of the United States Code governs the procedure for removal. "Because removal is entirely a statutory right, the relevant procedures to effect removal must be followed." Thompson v. Intel Corp., 2012 WL 3860748, at *5. A removal which does not comply with the express statutory requirements is defective and must be remanded to state court. See Huffman v. Saul Holdings LP, 194 F.3d at 1077. See also Chavez v. Kincaid, 15 F. Supp. 2d 1118, 1119 (D.N.M. 1998)(Campos, J.)("The [r]ight to remove a case that was originally in state court to federal court is purely statutory, not constitutional.").

      Section 1446(a) of Title 28 of the United States Code provides that a party seeking removal of a matter to federal court shall file a notice of removal in the district and division where the state action is pending, "containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." Such notice of removal is proper if filed within thirty-days from the date when the case qualifies for federal jurisdiction. See Caterpillar Inc. v. Lewis, 519 U.S. at 68-69; 28 U.S.C. § 1446(b). The Tenth Circuit has further elaborated that, for the thirty-day period to begin to run, "this court requires clear and unequivocal notice from the [initial] pleading itself" that federal jurisdiction is available. Akin v. Ashland Chem. Co., 156 F.3d 1030, 1036 (10th Cir. 1998). The Tenth Circuit specifically disagrees with "cases from other jurisdictions which impose a duty to investigate and determine removability where the initial

pleading indicates that the right to remove may exist."  Akin v. Ashland Chem. Co., 156 F.3d at 1036.[10]

After the notice of removal is filed, all state-court proceedings are automatically stayed, and the other defendants in the case -- if not all defendants joined in the removal -- have thirty days to consent to the removal of the action.  See 28 U.S.C. § 1446(b)(2).  "When a civil action is removed solely under section 1441(a) [the standard removal statute, which excludes multiparty, multiforum jurisdiction], all defendants who have been properly joined and served must join in or consent to the removal of the action."  28 U.S.C. § 1446(b)(2)(A).  The failure of all defendants to consent to removal will result in remand.  The rule of unanimity applies to all defendants, whether they are required parties under rule 19 or merely proper parties under rule 20.  Defendants who have not been served, however, need not join in removal.  See Kiro v. Moore, 229 F.R.D. 228, 230-32 (D.N.M. 2005)(Browning, J.).

Section 1447(c) permits the district court to "require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  28 U.S.C. § 1447(c).  The Supreme Court has stated that "[t]he appropriate test for awarding fees under § 1447(c) should recognize the desire to deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party, while not undermining Congress' basic decision to afford defendants a right to remove as a general matter, when the statutory criteria are satisfied."  Martin v. Franklin Capital Corp., 546 U.S. 132, 140 (2005).  The Tenth Circuit has limited district courts' discretion to impose costs and fees to those cases in which the removal was

---

[10]Congress recently clarified removal jurisdiction and procedures in the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 758.  See Thompson v. Intel Corp., No. CIV 12-0620 JB/LFG, 2012 WL 3860748, at *12 n.5 (D.N.M. Aug. 27, 2012)(Browning, J.)(discussing the Act).

objectively unreasonable.  See Garret v. Cook, 652 F.3d 1249, 1254 (10th Cir. 2011)("[C]ourts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal.").

### 3.      Fraudulent Joinder.

A defendant may remove a case to federal court based upon diversity jurisdiction in the absence of complete diversity if a plaintiff joins a nondiverse party fraudulently to defeat federal jurisdiction.  See Am. Nat'l Bank & Trust Co. v. Bic Corp., 931 F.2d 1411, 1412 (10th Cir. 1991); Hernandez v. Menlo Logistics, Inc., No. CIV 12-0907 JB/WPL, 2013 WL 5934411, at 14-17 (D.N.M. Sept. 30, 2013)(Browning, J.).   A defendant may remove on the basis of fraudulent joinder either while the nondiverse party is still joined or after it is dismissed from the case -- the doctrine can thus function as an exception to either complete diversity or the voluntary-involuntary rule.  "'[A] fraudulent joinder analysis [is] a jurisdictional inquiry,'" Bio-Tec Envtl., LLC v. Adams, 792 F. Supp. 2d at 1214 (quoting Albert v. Smith's Food & Drug Ctrs., Inc., 356 F.3d 1242, 1247 (10th Cir. 2004)), and, thus, the Tenth Circuit instructs that the district court should "pierce the pleadings, consider the entire record, and determine the basis of joinder by any means available," Dodd v. Fawcett Publ'ns, Inc., 329 F.2d 82, 85 (10th Cir. 1964)(citations omitted).  "A district court may disregard a nondiverse party named in the state court complaint and retain jurisdiction if joinder of the nondiverse party is a sham or fraudulent." Baeza v. Tibbetts, No. CIV 06-0407 MV/WPL, 2006 WL 2863486, at *3 (D.N.M. July 7, 2006)(Vazquez, J.).   The Supreme Court has stated: "Merely to traverse the allegations upon which the liability of the resident defendant is rested or to apply the epithet 'fraudulent' to the joinder will not suffice: the showing must be such as compels the conclusion that the joinder is without right and made in bad faith."  Chesapeake & Ohio Ry. Co. v. Cockrell, 232 U.S. 146,

152 (1914).  The Tenth Circuit has explained that allegations of fraudulent joinder complicate the analysis whether removal is proper, because, "[w]hile a court normally evaluates the propriety of a removal by determining whether the allegations on the face of the complaint satisfy the jurisdictional requirements, fraudulent joinder claims are assertions that the pleadings are deceptive."  Nerad v. AstraZeneca Pharms., Inc., 203 F. App'x 911, 913 (10th Cir. 2006)(unpublished).

The party asserting fraudulent joinder bears the burden of proof.  See Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *1 (10th Cir. 2000)(unpublished)("The case law places a heavy burden on the party asserting fraudulent joinder.").  "To justify removal based on diversity jurisdiction, a defendant must plead a claim of fraudulent joinder with particularity and prove the claim with certainty."  Couch v. Astec Indus., Inc., 71 F. Supp. 2d 1145, 1146-47 (D.N.M. 1999)(Baldock, J.).  Before 2013, the most recent published Tenth Circuit decision to state the burden of proof for demonstrating fraudulent joinder was issued over forty years earlier in Smoot v. Chicago, Rock Island & Pacific Railroad Co., 378 F.2d 879 (10th Cir. 1967).  The Tenth Circuit said that fraudulent joinder must be "established with complete certainty upon undisputed evidence."  Smoot v. Chi., Rock Island & Pac. R.R. Co., 378 F.2d at 882.

Actual fraud -- e.g., a plaintiff colluding with a nondiverse defendant to defeat removal[11] -- suffices to establish fraudulent joinder, but it is not required.  See McLeod v. Cities

---

[11]Collusion might look something like this: a plaintiff names a nondiverse defendant under a highly dubious theory of liability; the plaintiff contacts the defendant and offers to dismiss the case at the end of the one-year limitation, see 28 U.S.C. § 1446(c), if the defendant agrees not to move to dismiss before then; and the defendant agrees in order to save litigation costs, as well as avoid any slim chance that the court decides to recognize the plaintiff's theory of liability against it.

Serv. Gas Co., 233 F.2d 242, 246 (10th Cir. 1956)("[C]ollusion in joining a resident defendant for the sole purpose of preventing removal . . . may be shown by any means available."). In Smoot v. Chicago, Rock Island & Pacific Railroad Co., the Tenth Circuit stated two other bases for finding fraudulent joinder: (i) "[t]he joinder of a resident defendant against whom no cause of action is stated is patent sham"; or (ii) "though a cause of action be stated, the joinder is similarly fraudulent if in fact no cause of action exists." Smoot v. Chi., Rock Island & Pac. R.R. Co., 378 F.2d at 882 (quoting Dodd v. Fawcett Pubs., Inc., 329 F.2d 82, 85 (10th Cir. 1964)). In Smoot v. Chicago, Rock Island & Pacific Railroad Co., the Tenth Circuit found fraudulent joinder because the non-liability of the joined party was "established with complete certainty upon undisputed evidence." 378 F.2d at 882. "This does not mean that the federal court will pre-try, as a matter of course, doubtful issues of fact to determine removability; the issue must be capable of summary determination and be proven with complete certainty." Smoot v. Chi., Rock Island & Pac. R.R. Co., 378 F.2d at 882. In Smoot v. Chicago, Rock Island & Pacific Railroad Co., the plaintiff died when his car collided with a freight train. See 378 F.2d at 881. The plaintiff's estate sued the railroad company and joined a non-diverse alleged employee as a defendant. See 378 F.2d at 881. It was undisputed that the diversity-destroying party's employment with the railroad company had "terminated almost fifteen months before the collision and that he was in no way connected with the acts of negligence ascribed to him." 378 F.2d at 881.

In recent unpublished decisions, the Tenth Circuit has adopted different articulations of the burden of proof for fraudulent joinder, two of which are from the United States Court of Appeals for the Fifth Circuit. In Montano v. Allstate Indemnity Co., the Tenth Circuit quoted favorably Hart v. Bayer Corp., 199 F.3d 239 (5th Cir. 2000), which stated:

> To prove their allegation of fraudulent joinder [the removing parties] must demonstrate that there is no possibility that [plaintiff] would be able to establish a

cause of action against [the joined party], in state court.  In evaluating fraudulent joinder claims, we must initially resolve all disputed questions of fact and all ambiguities in the controlling law in favor of the non-removing party.  We are then to determine whether that party has any possibility of recovering against the party whose joinder is questioned.

Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *4-5 (alteration in original)(quoting Hart v. Bayer Corp., 199 F.3d at 246)(internal quotation marks omitted).  The Tenth Circuit stated that the standard for proving fraudulent joinder "is more exacting than that for dismissing a claim under Fed. R. Civ. P. 12(b)(6); indeed, the latter entails the kind of merits determination that, absent fraudulent joinder, should be left to the state court where the action commenced."  Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2.  The Tenth Circuit in Montano v. Allstate Indemnity Co. also quoted from Batoff v. State Farm Insurance Co., 977 F.2d 848 (3d Cir. 1992), which stated: "A claim which can be dismissed only after an intricate analysis of state law is not so wholly insubstantial and frivolous that it may be disregarded for purposes of diversity jurisdiction."  Batoff v. State Farm Ins. Co., 977 F.2d at 853.

In Nerad v. AstraZeneca Pharmaceuticals, Inc., the Tenth Circuit adopted a different articulation of the burden of proof.  The Tenth Circuit stated that, where fraudulent joinder is asserted, "the court must decide whether there is a reasonable basis to believe the plaintiff might succeed in at least one claim against the non-diverse defendant."  203 F. App'x at 913 (citing Badon v. RJR Nabisco, Inc., 224 F.3d 382, 393 (5th Cir. 2000)).  The Tenth Circuit explained that "[a] 'reasonable basis' means just that: the claim need not be a sure-thing, but it must have a basis in the alleged facts and the applicable law."  203 F. App'x at 913.

The Fifth Circuit recognized the inconsistencies in various articulations of the standard for fraudulent joinder and directly addressed the problem in Travis v. Irby, 326 F.3d 644 (5th Cir. 2003):

> Neither our circuit nor other circuits have been clear in describing the fraudulent joinder standard. The test has been stated by this court in various terms, even within the same opinion. For example, the Griggs [v. State Farm Lloyds, 181 F.3d 694 (5th Cir. 1999),] opinion states,
>
>> To establish that a non-diverse defendant has been fraudulently joined to defeat diversity, the removing party must prove . . . that there is *absolutely no possibility* that the plaintiff will be able to establish a cause of action against the non-diverse defendant in state court.
>
> 181 F.3d at 699 (emphasis added)(citing Burden v. Gen. Dynamics Corp., 60 F.3d 213, 317 (5th Cir. 1995)). The Griggs opinion later restates that test as follows -- "Stated differently, we must determine whether there is any reasonable basis for predicting that [the plaintiff] might be able to establish [the non-diverse defendant's] liability on the pleaded claims in state court." 181 F.3d at 699 (emphasis added). Similarly, in summing up federal law, Moore's Federal Practice states at one point: "To establish fraudulent joinder, a party must demonstrate . . . the *absence of any possibility* that the opposing party has stated a claim under state law." 16 Moore's Federal Practice § 107.14[2][c][iv][A] (emphasis added). It then comments: "The ultimate question is whether there is arguably a *reasonable basis* for predicting that state law might impose liability on the facts involved." Although these tests appear dissimilar, "absolutely no possibility" vs. "reasonable basis," we must assume that they are meant to be equivalent because each is presented as a restatement of the other.

326 F.3d at 647 (emphases in original). The Fifth Circuit has settled upon this phrasing:

> [T]he test for fraudulent joinder is whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant.

Smallwood v. Ill. Cent. R.R. Co., 385 F.3d 568, 573 (5th Cir. 2004)("To reduce possible confusion, we adopt this phrasing of the required proof and reject all others, whether the others appear to describe the same standard or not.").

In <u>Zufelt v. Isuzu Motors America, LCC</u>, 727 F. Supp. 2d 1117, 1124 (D.N.M. 2009)(Browning, J.), the Court addressed the standard courts should use when addressing fraudulent joinder and concluded that, to establish that a party was fraudulently joined, a defendant has the burden of demonstrating that "there is no possibility that the plaintiff would be able to establish a cause of action" against the party alleged to be fraudulently joined. 727 F. Supp. 2d at 1124-25 (citing <u>Montano v. Allstate Indem. Co.</u>, 211 F.3d 1278, 2000 WL 525592, at *4-5). The Court explained:

> [T]his District has consistently adopted the "possibility" standard when assessing fraudulent joinder claims. See <u>Allen v. Allstate Ins. Co.</u>, No. CIV 08-0733, 2008 WL 6045497 (D.N.M. Oct. 31, 2008)(Browning, J.)(holding that the claims asserted against the non-diverse defendant were "possibly viable under New Mexico law, and . . . sufficient to preclude federal jurisdiction"); <u>Baeza v. Tibbetts</u>, 2006 U.S. Dist. LEXIS 95317, at *11, 2006 WL 2863486 (stating that "[r]emand is required if any one of the claims against [the defendant] is possibly viable"); <u>Provencio v. Mendez</u>, No. CIV 05-623, 2005 U.S. Dist. LEXIS 39012, at *25, 2005 WL 3662957 (D.N.M. Sept. 29, 2005)(Browning, J.)(stating that "there must be no possibility the [p]laintiffs have a claim against [the non-diverse defendant]"); <u>Couch v. Astec Indus., Inc.</u>, 71 F. Supp. 2d at 1147 (stating that, to defeat removal jurisdiction, "[t]he plaintiff need only demonstrate the possibility of the right to relief"). This Court, in <u>Couch v. Astec Indus., Inc.</u>, noted with approval the language of the United States Court of Appeals for the Eleventh Circuit, which states that "if there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court." <u>Couch v. Astec Indus., Inc.</u>, 71 F. Supp. 2d at 1147 (quoting <u>Triggs v. John Crump Toyota, Inc.</u>, 154 F.3d 1284, 1287 (11th Cir. 1998))(emphasis in original).

<u>Zufelt v. Isuzu Motors Am., LCC</u>, 727 F. Supp. 2d at 1229.

In <u>Brazell v. Waite</u>, the Tenth Circuit stated that the "removing party must show that the plaintiff has 'no cause of action' against the fraudulently joined defendant," but it did not further elaborate on that burden. 2013 WL 2398893, at *3 (citing <u>Dodd v. Fawcett Publ'ns, Inc.</u>, 329 F.2d 82, 85 (10th Cir. 1964); <u>Roe v. Gen. Am. Life Ins. Co.</u>, 712 F.2d 450, 452 n.* (10th Cir. 1983)).

In 2013, the Tenth Circuit published its first opinion since 1946 regarding the burden of proof for demonstrating fraudulent joinder: "'To establish fraudulent joinder, the removing party must demonstrate either: (1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court.'" Dutcher v. Matheson, 733 F.3d 980, 988 (10th Cir. 2013)(Briscoe, C.J., joined by Seymour & Bacharach, J.J.)(quoting Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d 242, 249 (5th Cir. 2011)).  In Dutcher v. Matheson, the Tenth Circuit reviewed a district court's holding that it had diversity jurisdiction over a case where Utah citizens sued ReconTrust, a Texas-based national bank, Stuart T. Matheson, a Utah citizen, and Matheson's law firm.  See Dutcher v. Matheson, 733 F.3d at 983, 987.  The plaintiffs alleged that Matheson and his law firm enabled ReconTrust to conduct an illegal nonjudicial foreclosure by holding the foreclosure sales on behalf of the Texas-based bank.  See 733 F.3d at 983.  The defendants removed the case to federal court and alleged that the plaintiffs fraudulently joined the Utah defendants.  See 733 F.3d at 983.  The district court agreed, finding that, under Utah law, "an attorney cannot be held liable to a non-client absent fraud, collusion or privity of contract."  733 F.3d at 988.  The Tenth Circuit disagreed with that characterization of Utah law, finding instead that, in the case on which the defendants relied, the Utah Supreme Court "has simply limited the circumstances in which a lawyer owes a duty of care to non-clients from actions arising out of the provision of legal services." 733 F.3d at 988.  In rejecting the claim of fraudulent joinder, the Tenth Circuit said

> that does not mean that the plaintiffs have stated a valid claim against Matheson and his law firm.  Or even that Matheson and his law firm are not somehow fraudulently joined.  But the defendants needed to clear a high hurdle to prove something they have yet to prove, i.e., fraudulent joinder.

733 F.3d at 989.

The Tenth Circuit did not elaborate on the defendant's burden to show fraudulent joinder, except to say that it is "a high hurdle."  733 F.3d at 989.  It quoted, however, Cuevas v. BAC Home Loans Servicing, LP, a Fifth Circuit opinion that repeats the clarified standard from the Smallwood v. Illinois Central Railroad Co. case.  See Dutcher v. Matheson, 733 F.3d at 988 (10th Cir. 2013)(quoting Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d 242, 249 (5th Cir. 2011)).

> Under the second way, the test is "whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant."  [Smallwood v. Ill. Cent. R.R. Co., 385 F.3d at 573.]  If there is no reasonable basis of recovery, then the court can conclude that the plaintiff's decision to join the in-state defendant was indeed improper, unless that showing compels the dismissal of all defendants.  There is no improper joinder if the defendants' showing compels the same result for the resident and nonresident defendants, because this simply means that the plaintiff's case is ill founded as to all of the defendants.  Such a defense is more properly an attack on the merits of the claim, rather than an inquiry into the propriety of the joinder of the in-state defendant.

Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d at 249 (emphasis in original)(citations omitted)(internal quotation marks omitted).  Based on the Tenth Circuit's history of relying on Fifth Circuit analysis in fraudulent joinder cases, the Tenth Circuit would likely approve this additional explanation of the fraudulent joinder standard.  Accordingly, the Court will use the following standard for fraudulent joinder: whether the defendant has demonstrated that there is no possibility that the plaintiff will recover against an in-state defendant.  Cf. Zufelt v. Isuzu Motors Am., LCC, 727 F. Supp. 2d at 1124-25 (concluding that fraudulent joinder occurs when "there is no possibility that the plaintiff would be able to establish a cause of action" against the party alleged to be fraudulently joined).  No case sets forth the burden of proof that applies to (much rarer) allegations of actual fraud, such as plaintiff-defendant collusion, see note 11, supra,

at 39, and accompanying text, but the Court concludes that the clear-and-convincing standard -- the usual standard for fraud -- is appropriate, see, e.g., United States v. Thompson, 279 F.2d 165, 167 (10th Cir. 1960)("An allegation of fraud is a serious matter; it is never presumed and must be proved by clear and convincing evidence." (citations omitted)).

An unresolved question is whether fraudulent joinder permits the removal of actions that have been pending in state court for over a year.  Section 1446(c)(1) provides: "A case may not be removed under subsection (b)(3) on the basis of jurisdiction conferred by section 1332 more than 1 year after commencement of the action . . . ."  28 U.S.C. § 1446(c)(1).  The two district court cases from the Tenth Circuit to address the issue both concluded that it does not, but those opinions were issued before Congress amended § 1446 in 2012 to add the remainder (the omitted portion) of the sentence quoted earlier in this paragraph: "unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action." 28 U.S.C. § 1446(c)(1).  See Chidester v. Kaz, Inc., No. CIV 08-0776 TCK/PJC, 2009 WL 2588866, at *3 (N.D. Okla. Aug. 19, 2009)(Kern, J.); Caudill v. Ford Motor Co., 271 F. Supp. 2d 1324, 1327 (N.D. Okla. 2003)(Eagan, J.).  Outside the Tenth Circuit, the Courts of Appeals have said little, and district courts appear more-or-less evenly split on the issue, with some holding that a case can be removed on the basis of fraudulent joinder after the one-year mark, see Hardy v. Ajax Magnathermic Corp., 122 F. Supp. 2d 757, 759 (W.D. Ky. 2000); Johnson v. Heublein, Inc., 982 F. Supp. 438, 444-45 (S.D. Miss. 1997); Barnett v. Sylacauga Autoplex, 973 F. Supp. 1358, 1367 (N.D. Ala. 1997); Leslie v. BancTec Serv. Corp., 928 F. Supp. 341, 346 (S.D.N.Y. 1996); Morrison v. Nat'l Ben. Life Ins. Co., 889 F. Supp. 945, 950-51 (S.D. Miss. 1995); Saunders v. Wire Rope Corp., 777 F. Supp. 1281, 1282-83 (E.D. Va. 1991); Greer v. Skilcraft, 704 F. Supp. 1570, 1582-83 (N.D. Ala. 1989), and others concluding that the fraudulent-joinder

doctrine bows to the one-year limitation, see Ariel Land Owners, Inc. v. Dring, 245 F. Supp. 2d 589, 600-02 (M.D. Pa. 2003); Codner v. Am. Home Prods. Corp., 123 F. Supp. 2d 1272, 1274 (W.D. Okla. 2000); Hattaway v. Engelhard Corp., 998 F. Supp. 1479, 1481-82 (M.D. Ga. 1998); Russaw v. Voyager Life Ins. Co., 921 F. Supp. 723, 724-25 (M.D. Ala. 1996); Zumas v. Owens-Corning Fiberglas Corp., 907 F. Supp. 131, 133-34 (D. Md. 1995); Price v. Messer, 872 F. Supp. 317 (S.D. W. Va. 1995); Norman v. Sundance Spas, Inc., 844 F. Supp. 355, 356-57 (W.D. Ky. 1994); Santiago v. Barre Nat'l, Inc., 795 F. Supp. 508, 510-12 (D. Mass. 1992); Brock v. Syntex Labs., Inc., 791 F. Supp. 721, 722-23 (E.D. Tenn. 1992); Cofer v. Horsehead Research & Dev. Co., 805 F. Supp. 541, 543-44 (E.D. Tenn. 1991); O'Rourke v. Communique Telecomms., Inc., 715 F. Supp. 828, 829 (E.D. Mich. 1989).  Again, however, all of these cases came before the addition of 28 U.S.C. § 1446(c)(1), which grafted a bad-faith exception to the one-year limitation, discussed at length later in this opinion.  The Court concludes that the addition of the bad-faith exception to the one-year limitation clarifies that the one-year limitation is procedural, rather than jurisdictional, see Analysis Part I.A.1.d, infra, at 69-72 (explaining the rift that developed among the Courts of Appeals, before the passage of § 1446(c)(1), over whether the one-year limitation is procedural, and thus subject to waiver, or jurisdictional, and thus not subject to waiver or exception), and, thus, extends the applicability of fraudulent-joinder doctrine past the one-year mark.  Thus, defendants may remove a case on fraudulent-joinder grounds even after it has been pending in state court for more than one year.

Another unresolved question regarding fraudulent joinder is whether it creates an exception to the forum-defendant rule -- which provides that even an action with complete diversity cannot be removed if any defendant is a citizen of the forum state -- in addition to creating an exception to the rule of complete diversity.  See 28 U.S.C. § 1441(b)(2).  Courts and

commentators recite fraudulent joinder as involving the legally unjustifiable naming of a nondiverse party, a party who defeats complete diversity, or a diversity-spoiling party, but no case addresses whether the doctrine extends to the wrongful naming of a diverse party whose inclusion in the lawsuit nonetheless defeats removal because of the party's status as a citizen of the forum state.  See Brazell v. Waite, 525 F. App'x at 884 & n.3 (implying, but not holding or stating clearly, that fraudulent joinder is an exception to the forum-defendant rule, and noting an "apparent lack of ruling from any federal appellate court, and [a] split among district courts, on the issue" (citing Morris v. Nuzzo, 718 F.3d 660, 666 (7th Cir. 2013))); Hernandez v. Cooper Tire & Rubber Co., No. CIV 12-1399 JWL, 2013 WL 141648, at *2 n.2 (D. Kan. Jan. 11, 2013)("Some courts have extended the fraudulent joinder doctrine to diverse, in-state defendants in light of the forum defendant rule . . . ."  (citing Morris v. Mid-Century Ins. Co., No. CIV 12-0578 SEB/DML, 2012 WL 3683540, at *5 (S.D. Ind. Aug. 24, 2012), vacated and remanded sub nom. Morris v. Nuzzo, 718 F.3d 660)).  Although the policy justifications behind fraudulent-joinder doctrine would seem to apply just as strongly to the forum-defendant rule as they do to complete diversity, there is an important legal distinction between the two requirements: complete diversity is a requirement of original subject-matter jurisdiction and is found in § 1332; the forum-defendant rule is unique to removal jurisdiction -- it does not apply to cases filed in federal court in the first instance -- and is found in § 1441.   See 28 U.S.C. §§ 1332(a), 1441(b)(2).  Fraudulent joinder, however, only ever applies in the removal context, and does no work in cases filed in federal court in the first instance.  As such, the Court sees no principled reason to limit fraudulent-joinder doctrine's application to the joining of nondiverse parties to defeat complete diversity, while excluding the functionally identical practice of fraudulently joining forum-citizen defendants to defeat the forum-defendant rule.  The Court, therefore,

construes fraudulent-joinder doctrine as permitting removal whenever a plaintiff fraudulently joins a party that defeats removal jurisdiction, whether that defeat comes by way of complete diversity or the forum-defendant rule.

A district court's order to remand based on a finding of fraudulent joinder is not reviewable by the Tenth Circuit.  See Nerad v. AstraZeneca Pharms., Inc., 203 F. App'x at 913 (holding that, because the district court remanded based on its conclusion that it lacked subject-matter jurisdiction at the time of removal, 28 U.S.C. § 1447(d) precluded the Tenth Circuit from reviewing the order).  The fraudulent joinder inquiry on a motion to remand is a subject-matter jurisdiction inquiry.  See Albert v. Smith's Food & Drug Ctrs., Inc., 356 F.3d at 1247.

### 4.    Procedural Misjoinder.[12]

Rule 20 of the Federal Rules of Civil Procedure provides:

**(a)    Persons Who May Join or Be Joined.**

    **(1)    Plaintiffs.**  Persons may join in one action as plaintiffs if:

        **(A)**    they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

        **(B)**    any question of law or fact common to all plaintiffs will arise in the action.

---

[12]The Court refers to the doctrine as "procedural misjoinder," rather than "fraudulent misjoinder," because of the confusion that the word "fraudulent" has caused in the fraudulent joinder context.  As the Honorable Martha A. Vasquez, then-Chief District Judge for the United States District Court for the District of New Mexico, once explained: "Fraudulent joinder is a term of art. It does not reflect on the integrity of plaintiff or counsel, but rather exists regardless of the plaintiff's motives when the circumstances do not offer any other justifiable reason for joining the defendant."  Baeza v. Tibbetts, No. 06-0407 MV/WPL, 2006 WL 2863486, at *1 n.1 (D.N.M. July 7, 2006)(Vasquez, J.).   The Court will refer to the doctrine as "procedural misjoinder" to avoid expanding that confusion.  Flores-Duenas v. Briones, 2013 WL 6503537, at *22 n.8.

(2)   **Defendants.**  Persons -- as well as a vessel, cargo, or other property subject to admiralty process in rem -- may be joined in one action as defendants if:

    (A)   any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

    (B)   any question of law or fact common to all defendants will arise in the action.

(3)   **Extent of Relief.**  Neither a plaintiff nor a defendant need be interested in obtaining or defending against all the relief demanded.  The court may grant judgment to one or more plaintiffs according to their rights, and against one or more defendants according to their liabilities.

Fed. R. Civ. P. 20(a).

"Procedural misjoinder," also known as "fraudulent misjoinder," is a recent development that is related to fraudulent joinder, but distinct from it.  As Professor E. Farish Percy of the University of Mississippi School of Law has explained:

> Fraudulent misjoinder occurs when a plaintiff sues a diverse defendant in state court and joins a non-diverse or in-state defendant even though the plaintiff has no reasonable procedural basis to join such defendants in one action.  While the traditional fraudulent joinder doctrine inquires into the substantive factual or legal basis for the plaintiff's claim against the jurisdictional spoiler, the fraudulent misjoinder doctrine inquires into the procedural basis for the plaintiff's joinder of the spoiler.  Most state joinder rules are modeled after the federal joinder rule that authorizes permissive joinder of parties when the claims brought by or against them arise "out of the same transaction, occurrence, or series of transactions or occurrences" and give rise to a common question of law or fact.  Thus, in a case where the joined claims are totally unrelated, a federal district court may find removal jurisdiction pursuant to the fraudulent misjoinder doctrine even though the plaintiff has a reasonable substantive basis for the claim against the jurisdictional spoiler.

E. Farish Percy, Defining the Contours of the Emerging Fraudulent Misjoinder Doctrine, 29 Harv. J.L. & Pub. Pol'y 569, 572 (2006)(footnotes omitted).

The Eleventh Circuit formulated the doctrine in <u>Tapscott v. MS Dealer Service Corp.</u>, and explained its purpose as follows:

> Misjoinder may be just as fraudulent as the joinder of a resident defendant against whom a plaintiff has no possibility of a cause of action. A defendant's "right of removal cannot be defeated by a fraudulent joinder of a resident defendant having no real connection with the controversy." <u>Wilson v. Republic Iron & Steel Co.</u>, 257 U.S. 92, 97 (1921).

<u>Tapscott v. MS Dealer Serv. Corp.</u>, 77 F.3d at 1360 (footnote omitted).

The facts of <u>Tapscott v. MS Dealer Service Corp.</u> illustrate the doctrine's operation. The case involved two putative state law class actions, joined together in a single case: (i) a class action in which an Alabama resident alleged that four defendants, including an Alabama resident, had violated various provisions of Alabama fraud and consumer-protection law in connection with the "the sale of 'service contracts' on automobiles sold and financed in Alabama," 77 F.3d at 1355; and (ii) a class action in which Alabama alleged three defendants, including Lowe's Home Centers, a North Carolina resident, had violated Alabama consumer-protection law in connection with the sale of retail product, <u>see</u> 77 F.3d at 1355. The second class action named Lowe's Home Centers as "the putative defendant class representative for a 'merchant' class." 77 F.3d at 1355. This unified case matched particular plaintiffs "with particular defendants against whom they allege individual claims"; as relevant here, the only two class representatives for the class action were Alabama residents, and they asserted claims only against Lowe's Home Centers. 77 F.3d at 1359-60.

The district court concluded that there was no allegation of joint liability or conspiracy, and that the claims involved in the car-sales class action were "wholly distinct from the alleged transactions involved in the" retail-products class action. 77 F.3d at 1360. Rather, "[t]he only similarity between" the two classes was that they both alleged violations of Alabama statutory

law; "[s]uch commonality on its face [was] insufficient for joinder."  77 F.3d at 1360.  The

Eleventh Circuit agreed and explained:

> Although certain putative class representatives may have colorable claims against
> resident defendants in the putative "automobile" class, these resident defendants
> have no real connection with the controversy involving [the retail-products
> plaintiffs and] Lowe's in the putative "merchant" class action.  We hold that the
> district court did not err in finding an attempt to defeat diversity jurisdiction by
> fraudulent joinder.  We do not hold that mere misjoinder is fraudulent joinder, but
> we do agree with the district court that Appellants' attempt to join these parties is
> so egregious as to constitute fraudulent joinder.

77 F.3d at 1360.

The procedural misjoinder doctrine's reach outside the Eleventh Circuit is unclear.  The

Tenth Circuit recently described the doctrine's status as follows: "It appears that the Fifth Circuit

may also accept procedural misjoinder.  No circuit has rejected the doctrine, but the district

courts and the commentators are split."  Lafalier v. State Farm Fire & Cas. Co., 391 F. App'x at

739 (citing, for the proposition that the Fifth Circuit accepts the doctrine, Crockett v. R.J.

Reynolds Tobacco Co., 436 F.3d at 532-33; In re Benjamin Moore & Co., 309 F.3d 296, 298

(5th Cir. 2002)).  While the Tenth Circuit recognized that "[t]here may be many good reasons to

adopt procedural misjoinder," it declined to adopt the doctrine, because it would not have

changed the result in that case.  Lafalier v. State Farm Fire & Cas. Co., 391 F. App'x at 739.  See

14B Charles A. Wright & Arthur Miller, Federal Practice & Procedure § 3723, at 867-77 &

n.122 (3d ed. 2009)(confirming the developing doctrine's unclear status).  The Court, however,

has adopted the doctrine and applied it in two cases, although it concluded in both cases that no

procedural misjoinder occurred, and both cases thus resulted in remand.  See Ullman v. Safeway

Ins. Co., 995 F. Supp. 2d 1196 (D.N.M. 2013)(Browning, J.); Flores-Duenas v. Briones, 2013

WL 6503537.

- 52 -

**5.**     **The "Bad Faith" Exception to the One-Year Removal Bar for Diversity Cases.**

Since 1988, 28 U.S.C. § 1446 has provided that no case that has been pending more than one year in state court can be removed on the basis of diversity jurisdiction.[13]   On January 6, 2012, Congress put into effect the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 760, 762 ("JVCA"), which, among other changes, added a bad-faith exception to the one-year limitation.   As a result, the current subsection (c) is almost entirely new; it reads as follows, with the sole sentence of the statute that pre-exists the JVCA underlined:

> **Requirements; removal based on diversity of citizenship.** --
>
> **(1)**     A case may not be removed under subsection (b)(3) on the basis of jurisdiction conferred by section 1332 more than 1 year after commencement of the action, unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action.
>
> **(2)**     If removal of a civil action is sought on the basis of the jurisdiction conferred by section 1332(a), the sum demanded in good faith in the initial pleading shall be deemed to be the amount in controversy, except that --

---

[13]The one-year limitation applies only to standard diversity jurisdiction under 28 U.S.C. § 1332(a) and not to class actions removed under § 1332(d), which is a part of the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4-14 ("CAFA").  Although exempting CAFA from the one-year limitation appears to defy the § 1446(c)(1)'s text, which refers to cases brought "on the basis of jurisdiction conferred by section 1332," another section of Title 28 clarifies the issue:

> A class action may be removed to a district court of the United States in accordance with section 1446 (except that the 1-year limitation under section 1446(c)(1) shall not apply), without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants.

28 U.S.C. § 1453(b) (emphasis added).  See Reece v. Bank of N.Y. Mellon, 760 F.3d 771, 775-76 (8th Cir. 2014).

      **(A)**    the notice of removal may assert the amount in controversy if the initial pleading seeks --

           **(i)**    nonmonetary relief; or

           **(ii)**    a money judgment, but the State practice either does not permit demand for a specific sum or permits recovery of damages in excess of the amount demanded; and

      **(B)**    removal of the action is proper on the basis of an amount in controversy asserted under subparagraph (A) if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds the amount specified in section 1332(a).

  **(3)**  **(A)**    If the case stated by the initial pleading is not removable solely because the amount in controversy does not exceed the amount specified in section 1332(a), information relating to the amount in controversy in the record of the State proceeding, or in responses to discovery, shall be treated as an 'other paper' under subsection (b)(3).[14]

      **(B)**    If the notice of removal is filed more than 1 year after commencement of the action and the district court finds that the plaintiff deliberately failed to disclose the actual amount in controversy to prevent removal, that finding shall be deemed bad faith under paragraph (1).

28 U.S.C. § 1446(c) (boldface in original)(underscoring added to show pre-JVCA content).

---

[14]Subsection (b)(3) provides that,

[e]xcept as provided in subsection (c), if the case stated by the initial pleading is not removable, a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.

28 U.S.C. § 1446(b)(3).   The combination of subsection (c)(3)(A)'s new provisions and subsection (b)(3)'s pre-JVCA provisions means that the defendant's thirty-day clock to remove a case starts whenever they have sufficient information -- obtained from anywhere in the case, and not merely from the pleadings or settlement communications -- to conclude that the case meets the amount-in-controversy requirement.

A plaintiff's "bad faith" can manifest itself in either of the two requirements for diversity jurisdiction: (i) a plaintiff can name or retain nondiverse parties or forum-citizen defendants to defeat complete diversity or the forum-defendant rule, respectively; or (ii) it can obfuscate the quantity of damages it seeks for the purpose of defeating the amount-in-controversy requirement.[15]   It is clear how the Court should construe (ii) -- the Tenth Circuit's opinion in McPhail v. Deere & Co. has already fleshed out a detailed framework for analyzing the amount-in-controversy requirement, see Law Regarding Diversity Jurisdiction Part 2, supra, at 22-26 (describing McPhail v. Deere & Co. in detail), and the JVCA's legislative history indicates that, far from abrogating McPhail v. Deere & Co., section 1446(c)'s amount-in-controversy provisions were intended to codify the approach that the Seventh Circuit chartered in Meridian Securities Insurance Co. v. Sadowski and that the Tenth Circuit advanced in McPhail v. Deere & Co., see Report to the Committee on the Judiciary of the United States House of Representatives § 103, at 15-16, H.R. 112-10 (2011)(citing only two cases under the heading "Amount in controversy and removal timing," McPhail v. Deere & Co. and Meridian Securities Insurance Co. v. Sadowski, and stating that the JVCA's amendments "follow the lead of [those] cases"

---

[15]As previously explained, it was unclear before the JVCA's passage whether the common-law doctrine of fraudulent joinder creates an exception to the forum-defendant rule or just to complete diversity.   See Law Regarding Removal, Remand, Fraudulent Joinder, Procedural Misjoinder, and Bad Faith Part 3, supra, at 47-49.  The bad-faith exception, however, is statutory, and the statute applies to all cases in which "the plaintiff has acted in bad faith in order to prevent a defendant from removing the action."   28 U.S.C. § 1446(c)(1).  The statute's plain meaning thus includes both the bad-faith joinder of a nondiverse party -- which defeats removal jurisdiction by defeating original diversity jurisdiction -- and the bad-faith joinder of a forum-citizen defendant -- which only defeats removal jurisdiction.  Moreover, as the Court is largely writing on a blank slate in interpreting the bad-faith exception, it sees no reason to read in a nonsensical double standard.

(emphasis omitted).[16]  On the other hand, § 1446(c)'s text says nothing at all about (i), nor has

any court attempted to comprehensively define it.  The JVCA's legislative history gives the

_____

[16]The JVCA's legislative history provides:

Section 103(b)(3)(C) of the bill further amends subsection 1446(c) by inserting two new paragraphs, (2) and (3), to address issues relating to uncertainty of the amount in controversy when removal is sought, e.g., when state practice either does not require or permit the plaintiff to assert a sum claimed or allows the plaintiff to recover more than an amount asserted.  Although current practice allows defendants to claim that the jurisdictional amount is satisfied and remove, several issues complicate this practice.

First, circuits have adopted differing standards governing the burden of showing that the amount in controversy is satisfied.  The ''sum claimed'' and ''legal certainty'' standards that govern the amount in controversy requirement when a plaintiff originally files in Federal court have not translated well to removal, where the plaintiff often may not have been permitted to assert in state court a sum claimed or, if asserted, may not be bound by it.  Second, many defendants faced with uncertainty regarding the amount in controversy remove immediately -- rather than waiting until future developments provide needed clarification -- out of a concern that waiting and removing later will result in the removal's being deemed untimely.  In these cases, Federal judges often have difficulty ascertaining the true amount in controversy, particularly when removal is sought before discovery occurs.  As a result, judicial resources may be wasted and the proceedings delayed when little or no objective information accompanies the notice to remove.

Proposed new paragraph 1446(c)(2) allows a defendant to assert an amount in controversy in the notice of removal if the initial pleading seeks non-monetary relief or a money judgment, in instances where the state practice either does not permit demand for a specific sum or permits recovery of damages in excess of the amount demanded.  The removal will succeed if the district court finds by a preponderance of the evidence that the amount in controversy exceeds the amount specified in 28 U.S.C. § 1332(a), presently $75,000.

If the defendant lacks information with which to remove within the 30 days after the commencement of the action, the bill adds a new subparagraph 1446(c)(3)(A) to clarify that the defendant's right to take discovery in the state court can be used to help determine the amount in controversy.  If a statement appears in response to discovery or information appears in the record of the state proceedings indicating that the amount in controversy exceeds the threshold amount, then proposed subparagraph 1446(c)(3)(A) deems it to be an ''other paper'' within the meaning of paragraph 1446(b)(3), thereby triggering a 30-day

Court some clue as to the exception's basic nature, but, in answering this question -- what constitutes "bad faith" vis-à-vis improperly joining or keeping joined nondiverse parties or forum-citizen defendants -- the Court will have to stake out its own definition.

For the reasons explained in the Analysis, the Court construes the bad-faith exception as a two-step standard.  First, the Court inquires whether the plaintiff actively litigated against the

_____

period in which to remove the action.  The district court must still find by a preponderance of the evidence that the jurisdictional threshold has been met.

In adopting the preponderance standard, new paragraph 1446(c)(2) would follow the lead of recent cases.  See McPhail v. Deere & Co., 529 F.3d 947 (10th Cir. 2008); Meridian Security Ins. Co. v. Sadowski, 441 F.3d 536 (7th Cir. 2006). As those cases recognize, defendants do not need to prove to a legal certainty that the amount in controversy requirement has been met.  Rather, defendants may simply allege or assert that the jurisdictional threshold has been met.  Discovery may be taken with regard to that question.  In case of a dispute, the district court must make findings of jurisdictional fact to which the preponderance standard applies.  If the defendant establishes by a preponderance of the evidence that the amount exceeds $75,000, the defendant, as proponent of Federal jurisdiction, will have met the burden of establishing jurisdictional facts.

Under proposed subparagraph 1446(c)(3)(B), if the notice of removal is filed more than one year after the commencement of the action, and a finding is made that the plaintiff deliberately failed to disclose the actual amount in controversy to prevent removal, that finding would be deemed bad faith under paragraph (1).

Section 103(b)(4)(A) of the bill inserts a heading for subsection 1446(d). Section 103(b)(4)(B) makes a technical amendment replacing ''thirty'' with ''30'' each place it appears in section 1446.  Section 103(b)(4)(C) strikes current subsection (e) (a criminal removal provision, which is now codified as part of new section 1454).  Section 103(b)(4)(D) redesignates current subsection (f) as new subsection (e), and inserts a new heading.

Report to the Committee on the Judiciary of the United States House of Representatives § 103, at 15, H.R. 112-10 (2011).

District courts in other Circuits may need to grapple with the extent to which the JVCA codifies the McPhail v. Deere & Co. approach.  The Court, however, is in the Tenth Circuit, and McPhail v. Deere & Co. binds it unless intervening statute or Supreme Court case law invalidates the holding.  The JVCA's legislative history makes it clear that McPhail v. Deere & Co. remains intact.

removal spoiler in state court: asserting valid claims, taking discovery, negotiating settlement, seeking default judgments if the defendant does not answer the complaint, et cetera. Failure to actively litigate against the removal spoiler will be deemed bad faith; actively litigating against the removal spoiler, however, will create a rebuttable presumption of good faith. Second, the defendant may attempt to rebut this presumption with evidence already in the defendant's possession that establishes that, despite the plaintiff's active litigation against the removal spoiler, the plaintiff would not have named the removal spoiler or would have dropped the spoiler before the one-year mark but for the plaintiff's desire to keep the case in state court. The defendant may introduce direct evidence of the plaintiff's bad faith at this stage -- e.g., electronic mail transmissions in which the plaintiff states that he or she is only keeping the removal spoiler joined to defeat removal -- but will not receive discovery or an evidentiary hearing in federal court to obtain such evidence.

## ANALYSIS

The Plaintiffs did not act in bad faith by keeping the removal-spoiling defendants, Trujillo and the State Defendants, joined past the one-year mark, because the Plaintiffs actively litigated against them, and AMCO Insurance has produced no direct evidence to rebut the presumption of good faith that this active litigation creates. The Court interprets the bad-faith exception to apply to plaintiffs who keep a removal-spoiling party in the case past the one-year mark for the purpose of defeating removal, i.e., it applies when the removal spoiler would not have been in the case at the one-year mark but for the plaintiffs' deliberate forum manipulation. To create a workable gauge for this inquiry -- one that honors the bad-faith exception's statutory content and respects Congress' desire for additional removals, while protecting plaintiffs from unwelcome intrusions into their work-product and private litigation strategy -- the Court

construes the bad-faith exception to entail a two-step standard.  First, the Court looks to whether the plaintiff actively litigated against the removal-spoiling defendant in state court: asserting valid claims, taking discovery, negotiating settlement, seeking default judgments if the defendant does not answer the complaint, et cetera.  If the plaintiff did not actively litigate against the removal spoiler, then bad faith is established; if the plaintiff actively litigated against the removal spoiler, then good faith is rebuttably presumed.  In the standard's second step, the defendant may attempt to rebut the good-faith presumption with direct evidence of the plaintiff's subjective bad faith.  Although the Court will allow subjective evidence at the second step, the Court will only permit defendants to use the evidence they already have on hand, and will not permit discovery or provide an evidentiary hearing on the bad-faith issue.

After laying out its construction of the bad-faith exception, the Court will discuss concerns it has with construing the bad-faith exception as a standard rather than a rule: it will be difficult for defendants to prevail on a bad-faith removal and keep the case in federal court; it will be easy, however, for defendants to concoct a colorable bad-faith argument, remove the case to federal court, and then lose the remand battle without having costs assessed against them -- a result that the Court fears many defendants will prefer over staying quietly in state court.  The Court is thus concerned that the bad-faith exception is a recipe for many more improper removals.  These removals, while doomed for remand, will produce significant judicial inefficiency and needless friction between federal and state courts.  Ultimately, however, § 1446(c)(1)'s text demands a standard, and not a rule, and the Court must be faithful to the statutory text above all else.  Similarly, current Supreme Court precedent forecloses the other method of which the Court could conceive to curb wasteful improper removals -- presumptively imposing costs against defendants under § 1447(c) on all removals that result in remand.

I.   **THE COURT CONSTRUES THE BAD-FAITH EXCEPTION AS A TWO-STEP STANDARD.**

The Court fashions its two-step standard by first interpreting the statute's content and then forming a workable test to effectuate that content.  Section 1446's historical development and present-day text elucidate the exception's content.  The bad-faith exception does not codify fraudulent-joinder doctrine or expand it to reach new claims;[17] it has little to do with fraudulent joinder, and the plaintiff's assertion of legally or factually unsound claims does not trigger the exception.  Rather, the bad-faith exception prohibits plaintiffs from asserting good claims in bad faith: it permits removal whenever a plaintiff keeps a removal-spoiling party in the case past the one-year mark, and the removal-spoiling party is one whom the plaintiff would not have kept in the case but for the plaintiff's desire to defeat removal.

This subjective inquiry into the plaintiff's intent is a difficult test for courts to apply, and runs the risk of putting the plaintiffs' attorneys on the stand and asking them about their litigation strategy.  Furthermore, this subjective inquiry -- if it focused only on what is in the plaintiff's counsel's mind -- could result in the Court almost never sustaining removal, because the plaintiff can virtually always articulate some basis other than forum manipulation for keeping the removal spoiler in the case; because there is no marginal expense to the plaintiff associated with naming

---

[17]The bad-faith amendment has a significant impact on fraudulent-joinder doctrine, but it is an incidental impact.  Before the JVCA's passage, there was a split among courts whether a case could be removed on fraudulent-joinder grounds after the one-year mark.  See Law Regarding Removal, Remand, Fraudulent Joinder, Procedural Misjoinder, and Bad Faith Part 3, supra, at 47-49.  This split came as a result of the courts' differing conclusions whether the one-year limitation was procedural, and thus subject to waiver and exception, or jurisdictional, and thus not subject to waiver or exception.  See Analysis Part I.A.1.d, infra at 69-72.  After the JVCA's passage, the statute now contains an explicit exception to the one-year limitation: the bad-faith exception.  See 28 U.S.C. § 1446(c)(1).  Although the bad-faith exception has little to do with fraudulent joinder substantively, if the one-year limitation permits of an exception on one ground, there is little basis for continuing to conclude that it bars removals for fraudulent joinder.  See Law Regarding Removal, Remand, Fraudulent Joinder, Procedural Misjoinder, and Bad Faith Part 3, supra, at 47-49.

or keeping an additional defendant in a case, the plaintiff could then argue that the non-forum manipulation reason that he or she articulated, however weak, outweighs the nonexistent costs of joining or keeping the removal-spoiling defendant.  To craft a workable standard, the Court will not focus on whether the plaintiff was motivated by a desire to stay out of federal court, but will instead approach the issue by looking primarily at objective criteria, evaluating whether the plaintiff in fact pursued a non-forum-manipulation reason for joining and keeping the removal-spoiling defendant, i.e., whether the plaintiff actively litigated against the removal spoiler.

The Court will define "actively litigate" broadly.  The core incentive that the judicial system provides for plaintiffs to assert claims against defendants is money damages -- plaintiffs name defendants with the goal of obtaining a judgment against them and, ultimately, of collecting on that judgment.  Recovery is not the only permissible end for which a plaintiff can name a defendant, however, and plaintiffs often name defendants from whom they have no hope of recovering damages.   Provided that the plaintiff has colorable claims against the defendant -- and fraudulent-joinder doctrine, not the bad-faith exception, permits removal when the plaintiff lacks a colorable claim -- any of the following are permissible purposes for naming and keeping a defendant in a case: (i) recovering damages from the defendant pursuant to a judgment; (ii) obtaining a judgment against the defendant, even if the plaintiff knows the defendant will be unable to satisfy the judgment; (iii) obtaining a settlement from the defendant, even if the plaintiff has already decided that it would not under any circumstances be economical to take the defendant to trial; (iv) leveraging the claims against the defendant to encourage the defendant to testify on the plaintiff's behalf against other defendants; or (v) obtaining discovery from the defendant by virtue of the increased scope of discovery available against parties relative to nonparties.  If the plaintiff shows that he or she pursued any of these ends, then the Court will

presume that the plaintiff acted in good faith.  At that point, the defendant may attempt to rebut the good-faith presumption with evidence of the plaintiff's subjective bad faith, but the defendant may only use evidence already in his or her possession, and will not receive additional discovery or an evidentiary hearing to develop the bad-faith argument.

The Court will first describe how it interprets the bad-faith exception to apply to plaintiffs whose subjective desire to stay in state court is the but-for cause of their decision to keep the removal-spoiling party joined in the case past the one-year mark.  It will then describe how it crafted the two-step standard.

A. **THE COURT INTERPRETS THE BAD-FAITH EXCEPTION TO REQUIRE THE COURT TO GAUGE THE PLAINTIFF'S SUBJECTIVE INTENT TO DEFEAT REMOVAL.**

Interpreting the bad-faith exception is as much a matter of figuring out what it does not do as it is figuring out what it does.  First, the bad-faith exception is an exception only to the one-year limitation -- not to complete diversity or the forum-defendant rule.  If the plaintiff keeps a removal-spoiling party, i.e., a diversity-destroying party or a forum-citizen defendant, joined all the way through trial, then the defendant can never remove the case under the bad-faith exception, regardless how much "bad faith" the plaintiff had in doing so.  The text compels this interpretation: the bad-faith exception is linguistically linked to the one-year limitation by the conjunction "unless," meaning "[e]xcept on the condition that"; there is no suggestion that bad faith also constitutes an exception to the complete-diversity and forum-defendant rules, which are in different United States Code sections.  28 U.S.C. § 1446(c)(1) ("A case may not be removed . . . more than 1 year after commencement of the action, unless the district court finds that the plaintiff has acted in bad faith . . . ."); The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless").

Second, the bad-faith exception does not abrogate, nor is it an exception to, the voluntary-involuntary rule -- the rule that states that the plaintiff must voluntarily dismiss the removal spoiler, rather than the removal spoiler securing his or her own dismissal, for the case to be removable. The voluntary-involuntary rule pre-exists, by roughly a century, both the bad-faith exception and its parent rule, the one-year limitation. It would be odd to conclude that a rule, the voluntary-involuntary rule, whose operation was unaltered by the passage of a second rule, the one-year limitation, would then be altered or abrogated by passage of an exception to the second rule. Moreover, the voluntary-involuntary rule still does most of its work -- and, before the JVCA, did all of its work -- before the one-year mark. For example, if a defendant names a single nondiverse defendant and several diverse defendants, and the nondiverse defendant successfully moves to dismiss the case against him within a month of filing, the remaining, completely diverse defendants would still be unable to remove the case unless they could prove that the nondiverse defendant had been fraudulently joined. The core operation of the voluntary-involuntary rule has nothing to do with the one-year limitation, and the Court sees no reason why an exception to the one-year limitation would impact it.

Third, as the Court has already stated, the bad-faith exception is not a codification or expansion of fraudulent-joinder doctrine. Perhaps it should have been: fraudulent-joinder doctrine is a judicially created doctrine; if a defendant has a right to remove when there is complete diversity, and a single nondiverse party destroys diversity, then there must be something to prevent the plaintiff from naming a nondiverse defendant, against whom he or she has no valid claim, just to prevent removal. The historical development of § 1446 and the JVCA's legislative history, however, make it clear that the bad-faith exception does something different. It was designed to codify an equitable exception, which a minority of courts had

recognized, that applied to plaintiffs who joined -- and then, after one year, dismissed -- defendants that they <u>could</u> keep in the suit, but that they did not want to keep in the suit, except as removal spoilers.

Turning to what the bad-faith exception does, the statute's text offers little guidance, and what few clues it provides can be better understood once bad faith is separated from the much more intuitive concept of fraudulent joinder, which requires delving into the statute's historical development and legislative history.  That the inquiry focuses on the plaintiff's subjective intent can be gleaned from the statutory text, which forbids removal more than one year after filing "unless the district court finds that the plaintiff has <u>acted in bad faith in order to prevent</u> a defendant from removing the action."  28 U.S.C. § 1446(c)(1) (emphasis added).  These words strongly suggest intentionality and purpose.

### 1.    § 1446(c)(1)'s Historical Development and Legislative History.

The current § 1446(c)(1) evolved in four phases: (i) most modern provisions governing diversity jurisdiction and removal, including complete diversity, amount in controversy, and the forum-defendant rule, originated in the early days of the nation, and have never been any different; (ii) the Supreme Court devised the voluntary-involuntary rule and fraudulent-joinder doctrine around the turn of the nineteenth century; (iii) in 1988, Congress added the one-year limitation on removability; and (iv) in the twenty-first century, the Fifth Circuit created, and Congress subsequently codified, an equitable exception to the one-year limitation.

### a.    The Founding Era: The Constitutional and Statutory Basis of the Diversity Jurisdiction and Removal.

Article III of the United States Constitution provides that "[t]he judicial Power shall extend to all Cases, in Law and Equity, . . . between Citizens of different States."  U.S. Const. art. III, § 2, cl.1.  The common understanding is that the Framers included diversity jurisdiction

in the Constitution to counter insular state courts' prejudice against out-of-state defendants.  The

Honorable John Marshall, then-Chief Justice of the Supreme Court, captured this understanding

in an opinion written twenty-two years after the signing of the Constitution:

> However, true the fact may be, that the tribunals of the states will administer
> justice as impartially as those of the nation, to parties of every description, it is
> not less true that the constitution itself either entertains apprehensions on this
> subject, or views with such indulgence the possible fears and apprehensions of
> suitors, that it has established national tribunals for the decision of controversies
> between aliens and a citizen, or between citizens of different states.

Bank of U.S. v. Deveaux, 5 U.S. (Cranch) 61, 87 (1809).  See The Federalist No. 80 (Alexander

Hamilton).   Modern scholarship sheds some doubt on whether concerns about out-of-state

prejudice were sincere, as few contemporaneous accounts raise the concern.  See E. Farish Percy,

Making a Federal Case of It: Removing Civil Cases to Federal Court Based on Fraudulent

Joinder, 91 Iowa L. Rev. 189, 195-99 (2005)("Making a Federal Case of It").   At least one

scholar suggests that the Framers hoped to use federal forums as a way to apply federal law to

enforce the payment of debts between in-state debtors and out-of-state creditors, see Percy,

Making a Federal Case of It, supra, at 195-99, although Congress has always opted not to apply

federal law in diversity cases, see Rules of Decision Act, Judiciary Act of 1789, 28 U.S.C.

§ 1652 (present-day codification), and the Supreme Court ultimately foreclosed that approach

entirely some 140 years later, see Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)(holding that,

under the Constitution, federal courts must apply state law -- including state common law -- in

diversity cases).

From the beginning, Congress has granted diversity jurisdiction sparingly.  There has

always been a statutory amount-in-controversy requirement to trigger federal jurisdiction, see

Judiciary Act of 1789, 1 Stat. 73, and the statutory requirement of complete diversity keeps out,

at least conceptually, many more cases -- out of the total number of cases that could be

authorized under Article III -- than it permits, see note 5, supra, at 20.  This severe statutory narrowing of constitutional diversity jurisdiction suggests that early Members of Congress found the justifications for diversity jurisdiction less than fully compelling.  After all, if out-of-state discrimination were a serious concern, then there certainly would be better cause to permit federal jurisdiction in a case in which nine Virginia plaintiffs and one Massachusetts plaintiff sue a Massachusetts corporation in a Virginia state court -- a case over which the federal courts have never been granted jurisdiction -- than one in which a Massachusetts plaintiff sues a Connecticut defendant in a Virginia state court -- a case over which the federal courts have always had jurisdiction.  Given the intricacy of the federal diversity and removal jurisdiction statutes, it is hard to chalk up these seemingly incongruent results to lazy or imprecise drafting on Congress' part.

Some semblance of the traditional rationale for diversity can be found in the forum-defendant rule, which also dates back to the Founding.  See Judiciary Act of 1789 § 12, 1 Stat. 73.  The rule states that a forum-citizen defendant cannot remove a diversity action to federal court, even if there is complete diversity.  See 28 U.S.C. § 1441(b)(2).  Interestingly, the forum-defendant rule favors the plaintiff's choice of forum: it applies only to removal jurisdiction and not to original jurisdiction, so a plaintiff can still sue a forum-citizen defendant in federal court if the plaintiff chooses; also, there is no converse rule that prevents a forum-citizen plaintiff from filing in federal court, even though, theoretically, a forum-citizen plaintiff would no more need protection from a prejudiced state court than a forum-citizen defendant.

      **b.**      **At the Turn of the 19th Century, the Supreme Court Created the Voluntary-Involuntary Rule and Fraudulent-Joinder Doctrine.**

The courts added two important judicial glosses onto removal jurisdiction in the late 1800s and early 1900s: the voluntary-involuntary rule and fraudulent-joinder doctrine. "The voluntary-involuntary test originated some years ago apparently in Powers v. Chesapeake & Ohio Ry., 169 U.S. 92 (1898). What it requires is a voluntary act of the plaintiff which effects a change rendering a case subject to removal (by defendant) which had not been removable before the change." Debry v. Transamerica Corp., 601 F.2d at 487. The Supreme Court created fraudulent-joinder doctrine only a few years later in two seminal cases: Alabama Great Southern Railway Co. v. Thompson, 200 U.S. 206, 217 (1906), and Chesapeake & Ohio Railway Co. v. Cockrell, 232 U.S. 146, 153 (1914). See Law Regarding Removal, Remand, Fraudulent Joinder, Procedural Misjoinder, and Bad Faith Part 3, supra, at 47-49 (describing fraudulent joinder in detail).

Interestingly, the Supreme Court has not discussed either doctrine in roughly a century. The last Supreme Court case to address fraudulent joinder came in 1921, see Wilson v. Republic Iron & Steel Co., 257 U.S. 92 (1918), while the last to address the voluntary-involuntary rule appears to be from 1900, see Whitcomb v. Smithson, 175 U.S. 635 (1900), prompting the Tenth Circuit, in 1979, to ask whether the rule still exists, ultimately concluding it does, see DeBry v. Transamerica Corp., 601 F.2d at 487-88. A plaintiff could -- and still can -- defeat removal by threading the needle between fraudulent joinder and the voluntary-involuntary rule. If the plaintiff alleges claims against a removal-spoiling defendant and those claims are not so frivolous as to warrant removal for fraudulent joinder, then even if the removal-spoiling defendant ultimately has the claims dismissed on the merits, the case cannot be removed. The

JVCA's addition of the bad-faith exception does not change this state of affairs: if Congress had intended to close this loophole, the Court can think of no reason that it would do so only after the one-year mark, which is the bad-faith exception's sphere of operation. The JVCA might have been a better bill if it had closed this loophole than it is for adding a bad-faith exception to the one-year limitation, as there may be more wrong with a plaintiff keeping a case nondiverse by asserting nonviable claims than a plaintiff asserting viable claims against a party it intends to one day dismiss from the case.

<strong>c.      <u>Congress Added the One-Year Limitation in 1988.</u></strong>

Congress added the one-year limitation on removal in 1988. <u>See</u> Judicial Improvements and Access to Justice Act, Pub. L. No. 100-702, 102 Stat. 4642-73. The Act's legislative history states:

> Subsection (b)(2) amends 28 U.S.C. § 1446(b) to establish a one-year limit on removal based on diversity jurisdiction as a means of reducing the opportunity for removal after substantial progress has been made in state court. The result is a modest curtailment in access to diversity jurisdiction. The amendment addresses problems that arise from a change of parties as an action progresses toward trial in state court. The elimination of parties may create for the first time a party alignment that supports diversity jurisdiction. Under section 1446(b), removal is possible whenever this event occurs, so long as the change of parties was voluntary as to the plaintiff. Settlement with a diversity-destroying defendant on the eve of trial, for example, may permit the remaining defendants to remove. Removal late in the proceedings may result in substantial delay and disruption.

<u>Report to the Committee on the Judiciary of the United States House of Representatives</u> § 1009, at 72, H.R. 100-889 (1988).

Before the addition of the one-year limitation, diversity cases could be removed at any time when complete diversity arose, including during trial and even during jury deliberations at the end of trial, if the last removal jurisdiction-defeating party was dismissed during the trial. <u>See</u> Nathan A. Lennon, Note, <u>Two Steps Forward, One Step Back: Congress Has Codified the</u>

- 68 -

*Tedford* Exception, but Will Inconsistent Applications of "Bad Faith" Swallow the Rule?, 40 N.

Ky. L. Rev. 233, 236 (2013).  The judicial gloss of the voluntary-involuntary rule to the removal

statute prevented the most outrageous situations, *e.g.*, removal following dismissal of the final

removal-spoiling party at the close of the plaintiff's case-in-chief at trial, and limited removal to

situations in which the plaintiff voluntarily dismissed the removal-spoiling parties.   It was

counterbalanced by fraudulent-joinder doctrine, which provides that, if a plaintiff truly has no

colorable case against a removal-spoiling defendant, the case can be removed notwithstanding

the lack of complete diversity -- if the fraudulently joined party is still in the case -- or the

voluntary-involuntary rule -- if the fraudulently joined party has been dismissed from the case.

> **d.    In the 2000s, the Fifth Circuit Created an Equitable Exception to the One-Year Limitation, and Congress Codified It in § 1446(c).**

Before Congress added the bad-faith exception, the Courts of Appeals were split whether

the one-year limitation was jurisdictional or procedural.   The primary significance of this

distinction involved whether the limitation could be waived: if it is jurisdictional, then an action

removed after one year in state court would be outside the federal court's jurisdiction and must

be remanded; if it is procedural, then a plaintiff could waive the limitation and elect to stay in

federal court.   Most Courts of Appeals to conclude that the one-year limitation was procedural

limited the consequences of that holding to situations where the plaintiff failed to timely move to

remand after the defendant's post-one-year removal.   The Fifth Circuit went a step further,

reasoning that a party's inequitable conduct could constitute a pseudo-waiver just as easily as his

or her consent could.   In *Tedford*,

> Tedford, a resident of Eastland County, Texas, filed suit with Maria
> Castro, a resident of Johnson County, Texas, against Warner-Lambert and others.
> The original petition, filed in Johnson County, named only one nondiverse
> defendant, Dr. Stan Johnson.

In Texas, venue lies in the county in which all or substantially all of the events giving rise to the action occurred or in the defendant's home county. The original petition did not state whom Dr. Johnson treated, but was drafted to suggest that he treated both plaintiffs in Johnson County. Through venue-related discovery, Warner-Lambert learned that Dr. Johnson treated Castro (who had yet to suffer any injury from Rezulin) but not Tedford. In fact, Tedford's claims have no connection to Dr. Johnson or Johnson County. Upon Warner-Lambert's motion, the state court severed Tedford's claims and transferred her suit to Eastland County.

Prior to entry of the state court's order, Warner-Lambert informed Tedford of its intent to remove the suit to federal court on the ground of diversity of citizenship because Dr. Johnson was not a proper defendant. A mere three hours later, Tedford amended her petition to name her treating physician, Dr. Robert DeLuca, a resident of Eastland County, as a defendant. Warner-Lambert removed the action, asserting that both Johnson and DeLuca were fraudulently joined. The district court granted Tedford's motion to remand to state court.

The parties then entered into an agreement pursuant to Rule 11 of the Texas Rules of Civil Procedure to try the case in Eastland County state court and to a preferential trial setting. DeLuca filed a motion to abate the proceedings for sixty days because of Tedford's failure to give proper notice under Texas Medical Liability and Insurance Improvement Act. Without taking any discovery from DeLuca, Tedford signed and post-dated a Notice of Nonsuit before the one-year anniversary of the commencement of her action, but did not notify Warner-Lambert of the DeLuca nonsuit until after the expiration of the anniversary.

Soon after learning of the DeLuca nonsuit and ten days after the expiration of the one-year limit on removal on the basis of diversity of citizenship, Warner-Lambert once again removed the suit to federal court. Tedford moved to remand, claiming the one-year limit barred the removal. Warner-Lambert argued that Tedford's pattern of forum manipulation -- particularly her eleventh-hour joinder and then nonsuit of Dr. DeLuca -- justified application of an equitable exception to the one-year limit on removal. The district judge agreed, denied Tedford's motion to remand, and certified the issue for interlocutory appeal.

327 F.3d at 424-25 (footnotes omitted).

The Fifth Circuit, in an opinion that the Honorable Thomas M. Reavley, United States Circuit Judge, authored and in which the Honorable E. Grady Jolly and Edith H. Jones, United States Circuit Judges, joined, affirmed the district court's application of an "equitable exception" to the one-year limitation. 327 F.3d at 426-28. The opinion's reasoning was sparse, and it

focused exclusively on whether the one-year limitation should be subject to an equitable exception and not on what the exception should entail.   The opinion did not define the exception's scope or suggest relevant factors to its application.

The Fifth Circuit remained the only Circuit to endorse the equitable exception, and only three district courts outside the Fifth Circuit applied the exception and refused to remand a case on bad-faith grounds.   See Lafazia v. Ecolab, Inc., No. 06-0491 ML, 2006 WL 3613771 (D.R.I. Dec. 11, 2006); Rauch v. Rauch, 446 F. Supp. 2d 432 (D.S.C. 2006); In re Rezulin Prods. Liab. Litig., MDL No. 1348, 2003 WL 21355201 (S.D.N.Y. June 4, 2003).   Thirteen district court opinions within the Fifth Circuit denied remand on bad-faith grounds, but none of those appear to set forth a detailed framework for applying the exception.   The Fifth Circuit has not come back to the so-called Tedford exception, either before or after the JVCA's passage.   One of the few common features that the Court has identified in surveying the body of Fifth Circuit district court case law applying the Tedford exception is that the courts have viewed it as significant -- cutting strongly in favor of finding bad faith -- when a plaintiff dismisses a removal spoiler without ever taking discovery from him or her.   See generally E. Farish Percy, The Tedford Equitable Exception Permitting Removal of Diversity Cases After One Year: A Welcome Development or the Opening of Pandora's Box?, 63 Baylor L. Rev. 146, 179 & n.220 (2011)("The Tedford Equitable Exception")(cataloguing cases that apply the Tedford exception).

Nonetheless, Congress passed the JVCA in 2011, clarifying that the one-year limitation is procedural and creating a bad-faith exception modeled after the Tedford exception.   See Law Regarding Removal, Remand, Fraudulent Joinder, Procedural Misjoinder, and Bad Faith Part 5, supra, at 53-54 (describing the effects of the JVCA on § 1446(c)).   The legislative history indicates Congress' intent:

New paragraph 1446(c)(1) adds to the current 1-year limitation on removal of diversity actions a limited exception, authorizing district courts to permit removal after the 1-year period if the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action.

In 1988, Congress amended this statute to prohibit the removal of diversity cases more than one year after their commencement. This change was intended to encourage prompt determination of issues of removal in diversity proceedings, and it sought to avoid the disruption of state court proceedings that might occur when changes in the case made it subject to removal. The change, however, led some plaintiffs to adopt removal-defeating strategies designed to keep the case in state court until after the 1-year deadline passed. In those situations, some courts have viewed the 1-year time limit as ''jurisdictional'' and therefore an absolute limit on the district court's jurisdiction. Other courts have viewed the period as ''procedural'' and therefore subject to equitable tolling (e.g., Tedford v. Warner-Lambert Co., 327 F.3d 423 (5th Cir. 2003)). In light of some ambiguity in the case law (compare Bowles v. Russell, 551 U.S. 205 (2007)(rejecting equitable tolling) with Holland v. Florida, 130 S. Ct. 2549 (2010)(accepting such tolling)), inclusion of statutory language to resolve the conflict is appropriate.

Proposed paragraph 1446(c)(1) grants district court judges discretion to allow removal after the 1-year limit if they find that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action. The inclusion in the new standard of the phrase ''in order to prevent a defendant from removing the action'' makes clear that the exception to the bar of removal after one year is limited in scope.

Report to the Committee on the Judiciary of the United States House of Representatives § 103, at 15, H.R. 112-10 (2011). The other cases cited, besides Tedford, have nothing to do with removal; they are cases in which the Supreme Court discussed equitable tolling of different statutory time periods.

The legislative history establishes that Congress intended to spread the Fifth Circuit's emerging Tedford doctrine across all twelve Courts of Appeals, rather than codify or expand fraudulent joinder, abrogate the voluntary-involuntary rule, or advance any other end that the text, read in isolation, could be construed to further. Importantly, it also establishes that bad-faith joinder exists at all: § 1446(c)(3)(B) provides that, "[i]f the notice of removal is filed more than 1 year after commencement of the action and the district court finds that the plaintiff

deliberately failed to disclose the actual amount in controversy to prevent removal, that finding shall be deemed bad faith under paragraph (1)."   28 U.S.C. § 1446(c)(3)(B).   Looking at § 1446(c)'s text alone, one could also reasonably conclude that the bad-faith exception can be triggered only by obfuscating the amount in controversy and not by improperly joining a spoiler. Because Tedford had nothing to do with the amount-in-controversy requirement, the legislative history establishes that "bad faith," as used in § 1446(c)(1), has a meaning that includes, but goes beyond, the situation outlined in § 1446(c)(3)(B).

### 2.   The Court Interprets "Bad Faith" as a But-For Test of the Plaintiff's Subjective Desire for Removal.

"Bad faith" does not mean anything in a vacuum.   Black's Law Dictionary 159 (9th ed. 2009)(defining "bad faith" as "[d]ishonesty of belief or purpose").   The Court can conceive of three ways of defining bad faith in this context.   At one end of the spectrum, the Court could require the plaintiff to exhibit inappropriate behavior -- such as fraudulent joinder -- beyond forum manipulation to find bad faith.   This interpretation would involve reading two sequential phrases of the exception, "acted in bad faith," and "in order to prevent . . . remov[al]," as separate, cumulative requirements for triggering removal.   28 U.S.C. § 1446(c)(1).   The Court concludes that § 1446(c)(1)'s history forecloses this interpretation; Congress intended to codify an emerging Fifth Circuit doctrine, the Tedford exception, in § 1446(c)(1), and those cases, including Tedford itself, did not identify any misconduct other than the plaintiffs' forum manipulation as the cause for applying the exception.   At the other extreme, the Court could interpret the bad-faith exception to warrant removal whenever the plaintiff's actions are partially motivated by a desire to stay in state court, regardless whether that desire was the but-for cause of the plaintiff keeping the removal spoiler in the case.   This reading, however, would allow the bad-faith exception to swallow the one-year limitation almost entirely, as almost all plaintiffs

strongly desire a state forum,[18] and, thus, view removal spoilers as welcome additions to the case caption.

Bad faith should not refer simply to a desire to stay in state court; the Court will demand that this desire be the but-for cause of the plaintiff's decision to keep the removal spoiler joined in the case past the one-year mark.  Adding the but-for requirement is consistent with the general legal principle of causation and avoids reading the one-year limitation out of existence. Additionally, it reflects that no pre-existing duty animates the bad-faith exception.  There is nothing wrong with plaintiffs having a preference for state court, nor is there anything inherently

---

[18]Regardless of the Framers' intentions, modern plaintiffs' aversion to federal court, and modern defendants' preference for it, have little to do with out-of-state prejudice.  Plaintiffs prefer to argue in front of state judges, who are often elected, rather than appointed, and who often do not have law clerks.  They also prefer state juries, who are often selected from driver-license registries, to federal juries, who are often selected from voter-registration rolls. Additionally, perhaps as a result of the greater influence of trial lawyers organizations on state legislatures and judiciaries than on their federal counterparts -- for one thing, state judges are often not life-tenured -- or perhaps because national corporate defendants have a greater ability to exert influence in Washington than in the fifty capitals of the states in which they do business, procedural practice has diverged in a number of ways between the federal and state courts. These divergences almost always fall in the same direction: state courts favor plaintiffs while federal courts favor defendants.  Federal pleading standards are often higher, especially after Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009); rule 11's demands are more stringent, and its sanctions harsher, than many of its state counterparts, see Gregory P. Joseph, Federal Litigation -- Where Did It Go off Track?, 34 Litigation 5 (2008); federal courts require mandatory disclosure of certain information at the front end of discovery, see Fed. R. Civ. P. 26(a); federal courts are more apt to grant summary judgment, usually in favor of defendants, see Joe S. Cecil, Rebecca N. Eyre, Dean Miletich & David Rindskopf, A Quarter Century of Summary Judgment Practice in Six Federal District Courts, 4 J. Empirical Legal Studies, 861 (2007); federal courts are less liberal in admitting expert testimony at trial, see Joseph, supra, at *5-6; and, if a plaintiff is lucky enough earn a favorable verdict but is unhappy with the figure on the verdict form, the Supreme Court, unlike many state courts, does not countenance additur, see Dimick v. Schiedt, 293 U.S. 474, 486 (1935); ClearOne Commc'ns, Inc. v. Biamp Sys., 653 F.3d 1163, 1179 (10th Cir. 2011).

These divergences are just the ones that apply generally across the nation.  In New Mexico, plaintiffs' preference for state court may be stronger than in most places.  The New Mexico state courts are generally perceived as relatively liberal and plaintiff-friendly; on the federal side, however, the Tenth Circuit is a comparatively conservative institution.

invidious or "bad faith" about using deliberate tactics to defeat federal jurisdiction.  As masters of their complaints, plaintiffs are allowed to forego federal causes of action to defeat federal-question jurisdiction and to forego potentially recoverable damages to avoid meeting the amount-in-controversy requirement.[19]  Conversely, a plaintiff who wants a federal forum can also forego valid claims against nondiverse defendants -- provided they are not required parties under rule 19 -- to create complete diversity.  See Fed. R. Civ. P. 19.  It is difficult to define "bad faith" in the absence of some clear, agreed-upon duty to do something.  Even in this context, joining and keeping removal spoilers for the purpose of defeating diversity, plaintiffs can still do it; they must now simply keep the removal spoiler on board through trial to avoid the bad-faith exception.  Any attempt the Court makes to discern such a duty is doomed to be tightly circular: (i) the plaintiff has a duty to accede to removal when the defendant has a right to remove; (ii) a defendant has a right to remove, under the statute, when the plaintiff acts in bad faith; and (iii) the plaintiff acts in bad faith when he or she violates the duty to accede to removal.  It would be odd for to penalize the plaintiff so harshly for an impulse -- desire to remain in state court -- that they can still pursue by the using deliberate, and just as facially deceptive, tactics in slightly different contexts.

**B.**   **THE COURT ADOPTS A TWO-STEP STANDARD FOR DETERMINING BAD FAITH.**

The Court's interpretation of the bad-faith exception as calling for a but-for test of subjective intent is not, without more, a workable standard to apply in most real-world cases. For one thing, a literal application of the standard would likely result in it almost never being

---

[19]In New Mexico state-court practice, the plaintiff cannot allege a dollar value in his or her complaint.  See N.M.R. Civ. P. 1-008A(3) ("Unless it is a necessary allegation of the complaint, the complaint shall not contain an allegation for damages in any specific monetary amount.").  It is common practice in small cases, however, for the plaintiff to stipulate to recovering an amount less than $75,000.00 to avoid federal jurisdiction.

satisfied.  The way this test would work in principle -- in the absence of direct evidence, into which, as the Court explains below, it is unwilling to delve -- is that the Court would weigh the potential non-forum-manipulation benefits the plaintiff stands to gain by naming the removal spoiler against the costs the plaintiff incurs by naming the spoiler, and economic rationality of keeping the spoiler provides a strong clue whether the plaintiff would keep the spoiler in the case but for the forum-manipulation benefits.  There are, however, almost no necessary costs associated with naming an additional defendant; defendants usually waive service, and discovery need not be taken from any party.  A but-for test for bad faith is thus tantamount to asking whether the sole reason for the joinder was to defeat removal.  This standard is impossibly high. Plaintiffs often name defendants for whom they do not have any particular plans; the plaintiffs suspect that they are judgment-proof and might not even believe they have any useful information for discovery.  The idea is to shake loose as much potential recovery and information as possible, and there is little harm to society and no cost to the plaintiff in naming defendants against whom the plaintiff has colorable claims.  Separating defendants that a plaintiff joins to cover his or her bases from defendants that a plaintiff joins to defeat removal is a daunting task, even assuming perfect evidence.

### 1.    The Standard's First Step Is That Active Litigation Creates a Rebuttable Presumption of Good Faith.

The Court cannot usually discern the plaintiff's subjective intent, and the economic balancing test described immediately above, which would otherwise seem sensible, will almost invariably justify the plaintiff's actions.  The Court will thus, instead, focus its inquiry on whether the plaintiff actively litigated against the removal spoiler in state court.  The Court notes, at the outset, that this active litigation inquiry is a proxy for the statutory inquiry; it relies on circumstantial evidence of intent and is thus under-inclusive and, at least theoretically, over-

inclusive.  It is under-inclusive because a plaintiff can actively litigate against a removal spoiler even though the plaintiff is only keeping the spoiler in the case for the forum manipulation purposes.  While this course of action may have been irrational before the JVCA, the bad-faith exception incentivizes its own satisfaction, and plaintiffs will be able to defeat removal under the exception by jumping through the hoops of actively litigating in state court.[20]  The active-litigation standard is over-inclusive, because a plaintiff could keep a defendant in a case without litigating against him or her, but nonetheless desire the defendant's presence in the case for reasons other than forum manipulation.  For example, if the case is slow-moving, the plaintiff may have been putting off taking discovery from the removal spoiler until after the one-year mark, and then received an acceptable settlement offer from the spoiler before any discovery was taken; given that discovery is not costless, naming and retaining a defendant is, in this scenario, perfectly plausible.  That there are diverse parties, i.e., not removal spoilers, out there who have

---

[20]The only standard that would truly work is a secret standard, i.e., one about which plaintiffs do not know and to which they cannot conform their behavior.  If plaintiffs believe that no bad-faith exception exists and that they are thus absolutely immune to removal after a year in state court, they might engage in behavior that is easily identifiable as bad faith, such as dismissing removal spoilers on day 366 in state court or even openly admitting that a party was joined only to defeat diversity.  Taking this concept a step further, if plaintiffs were falsely informed that a case could never be removed to federal courts once it is filed in state courts, then their behavior in this situation -- whether a plaintiff kept a nondiverse party joined past the one-year mark -- would provide definitive proof that the plaintiff did not join or retain the party only to defeat removal.

By keeping the bad-faith exception nebulous, unpredictable, and open to different constructions from judge to judge, the courts benefit from this same hide-the-ball effect.  It is, however, impractical to expect -- even if it were desirable, which the Court doubts -- that the federal courts can ever keep a doctrine from being known and understood by the plaintiffs' bar forever.  The courts will one day have to tell plaintiffs, in clear terms, what they have to do to avoid being punished for "bad faith."  From that day forward, the observer effect will kick in, and the test that the courts designed will become the tool that plaintiffs use to insulate themselves from removal.  It would defy well-accepted scientific and economic principles for plaintiffs to fail to adjust their behavior in response to the changed incentives of a new standard.

been joined to cases for over a year without being actively litigated against is a testament to the standard's over-inclusivity.

Still, the active-litigation proxy is not an unreasonable one, and it can be proven by factual evidence that the parties already have on hand when they enter federal court: the discovery taken against different parties, the hours spent negotiating settlements, and any motion practice in which the parties engaged in state court. As the Court has already stated, it takes a wide-open view of what constitutes active litigation; any one form of active litigation satisfies the standard's first step. Most often, the relevant factor will be whether the plaintiff took discovery from the defendant, although the plaintiff can satisfy the standard even if he or she did not take discovery if he or she engaged in any other form of active litigation, such as seeking a default judgment against a removal-spoiling defendant who does not respond to the complaint within the required timeframe or settling the case for more than nominal damages with a removal spoiler from whom the defendant has not yet taken discovery.

The Court will set forth a few firm principles for when a plaintiff's litigation efforts qualify him or her for the rebuttable presumption of good faith. Any non-token amount of discovery or other active litigation against a removal spoiler entitles the plaintiff to the presumption. In assessing whether a quantum of litigation is token, the Court will consider the amount of litigation commenced against the spoiler in light of: (i) the amount of time the spoiler spent joined to the case -- the Court will expect less discovery taken from a spoiler joined for six months than from one joined for a year; and (ii) the size and money value of the case -- the Court expects that discovery and motion practice bear some proportionality to the case's worth. The Court recognizes some danger in consideration (i); the Court does not want to incentivize plaintiffs to name and drop multiple removal spoilers over the course of the first year in state

court, but, rather, thinks it preferable for at least one single removal spoiler to be present in the case throughout the first year -- that way, if the plaintiff's claims against the spoiler are frivolous, the defendant has ample time to develop a fraudulent-joinder argument without the plaintiff playing a shell game of rotating different removal spoilers through the case at different times. The Court will, thus, demand a separate showing of active litigation against every removal spoiler who is, at any time before the one-year mark, the only removal spoiler in the case.

### 2.   In the Second Step, the Court Will Consider Evidence Offered to Rebut the Good-Faith Presumption Created in the First Step.

If the plaintiff can establish that he or she actively litigated against the removal spoiler, the plaintiff is entitled to a rebuttable presumption of good faith.  The defendant may attempt to rebut this presumption with direct evidence of bad faith, but is limited to the evidence that he or she has on hand: the defendant may not take discovery in federal court or call witnesses at a hearing to develop this rebuttal; the defendant may, however, produce affidavits.  The Court gives five justifications for this evidentiary limitation.  First and foremost, the Court does not want to open the plaintiff up to intrusions into its attorneys' strategy, their opinions about what avenues of discovery are likely to be fruitful, and their impressions regarding likely recovery from various defendants -- otherwise known as attorney work-product.  It would be unfair to disclose this proprietary information to the defendants, and, even if the bad-faith exception contemplated in camera review, the Court is resistant to demanding this information from an attorney who might subsequently have to prosecute his or her case in front of the Court.  The Court generally avoids putting attorneys on the stand or otherwise in positions where they are obligated to waive privileges to bring out favorable evidence, which might occur if an attorney had good-faith reasons for joining a removal-spoiling party.  Even indirect evidence of good faith comes perilously close to prying into the plaintiff's work-product and attorney-client

relationship.  For example, if the Plaintiffs in this case dismissed Trujillo because he offered to testify against AMCO Insurance, revealing that information at the motion-to-remand stage might undermine the Plaintiffs' plan to conceal Trujillo's cooperation until a later date.  Courts assiduously avoid making this kind of inquiry, and if Congress had intended to open up plaintiffs' attorneys to mind-probing depositions on their strategies and overrule the common-law work-product doctrine, then it likely would have said so in clearer terms.

Second, and perhaps most obviously, the Court does not want to expend any more judicial or litigation resources on these issues than necessary.  Direct evidence of subjective intent, e.g., an electronic mail transmission from the plaintiff to the defendant saying "[removal spoiler] is only in the case because he keeps it nondiverse," will not exist in most cases, and the Court has no desire to set up a costly and time-consuming discovery period or evidentiary hearing when it will turn out fruitless in most cases.  Third, and relatedly, even if some plaintiffs' attorneys were to honestly admit to bad-faith intentions on the stand, the Court dislikes the strong disincentives this creates regarding candor to the tribunal, particularly if this candor persists throughout a lengthy examination on the attorney's case strategy.  Fourth, the statute requires that the defendant have evidence of bad faith to remove the case in the first place and not just to keep the case in federal court once it is removed.  Congress could have placed the bad-faith exception in § 1447, the remand statute, but, instead, it put the exception in the removal statute. The result is normatively desirable, as well as textually sound: defendants cannot use removal under the bad-faith exception as a fishing expedition for evidence of the very basis of the removal.  Fifth, the evidentiary limitation in step two effectuates something of a trade-off for the active-litigation standard of step one.  As already discussed, the active-litigation standard is over-inclusive, and it results in more removals than a standard that requires direct evidence of

subjective intent, which plaintiffs could usually satisfy by simply keeping quiet about their bad faith, or an economic balancing test, which plaintiffs could satisfy by pointing to any positive-value, non-forum-manipulation benefit to naming the removal spoiler.  Prohibiting discovery is a fair counterbalance to the active-litigation standard for the Court to protect the plaintiff's sensitive strategic opinions, impressions, and litigation goals, from unwelcome, adversarial, non-reciprocal prying.

The substantive operation of the second step will vary depending on the quantity and quality of the defendant's evidence, but the Court will make a few points on the front end.  First, the Court will draw all reasonable inferences in the plaintiff's favor.  There is a general presumption against removal, see, e.g., Laughlin v. Kmart Corp., 50 F.3d 871, 873 (10th Cir. 1995), and a policy justification for keeping the bad-faith exception narrow, see Analysis Part II, infra, at 82-90, and, if the standard's first step is to mean anything, there is a need for the good-faith presumption to have bite.  Second, the Court is more concerned with the quality of evidence than the quantity.  The Court wants a smoking gun or close to it.  The suspicious timing of a dismissal, a drop in a settlement offer to the removal spoiler after the one-year mark,[21] or an

---

[21]Settlement premiums are another reason to disfavor an expansive view of the bad-faith exception.  If a plaintiff names multiple diverse defendants and a single nondiverse defendant, then the plaintiff may rationally demand a larger settlement from the nondiverse defendant than the true expected value of the plaintiff's case.  The expected value of the plaintiff's claims against the removal spoiler is the summation of all products of each potential damages figure multiplied by its corresponding probability.  The nondiverse defendant's presence in the case, however, imparts additional value onto the plaintiff's claims against the diverse defendants, because those claims have a lower expected value in federal court, where the case will be removed once the nondiverse defendant is dismissed.  The plaintiff may, and in fact should, demand that the nondiverse defendant cover that loss of value in the form of a settlement premium, but, because the nondiverse defendant experiences no corresponding benefit from the case's removal to offset the settlement premium, the nondiverse defendant may rationally reject the settlement offer, stay in the case, and keep the case in state court.  No part of this process constitutes bad faith under the exception.

ambiguous comment about how the plaintiff plans to drop the removal spoiler before trial, will not suffice.  If a defendant wants the removal to stick, then he or she should be able to show either: (i) that the plaintiff did not litigate at all, or engaged in a mere scintilla of litigation against the removal spoiler; or (ii) that the defendant has strong, unambiguous evidence of the plaintiff's subjective intent, for which the plaintiff cannot offer any plausible alternative explanation.

## II.   THE COURT HAS CONCERNS ABOUT THE BAD-FAITH EXCEPTION'S IMPACT ON FUTURE LITIGATION.

The Court has fashioned a standard that it believes effectuates congressional intent and is faithful to the statutory text, but the Court has concerns about the consequences that the bad-faith exception will have -- either under the Court's construction or any other reasonable construction. At best, plaintiffs will figure out that they can avoid the exception by simply keeping a removal spoiler joined through trial, thus defeating complete diversity, or waiting for the spoiler to secure his or her own dismissal, thus implicating the voluntary-involuntary rule.  If this result happens, then the exception will do nothing at all, will result in no additional removals, and will impose expenses on the plaintiff, the spoiler, and the state court as a result of the spoiler's continued presence in the case.  At worse, courts will fail to define the exception with adequate clarity, plaintiffs will remain unaware of its operation, if not its existence, and removals -- most of which are doomed for remand -- will multiply across all twelve Circuits the way they already have in the Fifth Circuit.  See Percy, The Tedford Equitable Exception, supra, at 179 & n.220.

### A.   THE COURTS COULD CONSTRUE THE BAD-FAITH EXCEPTION AS AN OBJECTIVE, BRIGHT-LINE RULE, BUT § 1446(c)(1)'S TEXT FORBIDS SUCH A CONSTRUCTION.

Section 1446(c)(1)'s text calls for a standard, and that is perhaps the most difficult thing about the bad-faith exception.  "Bad faith" is quintessential subjective standard language, and the

most natural interpretation of the provision is that removal is justified when the plaintiff's desire to defeat removal is the but-for cause of his or her decision to keep the removal-spoiling party in the case past the one-year mark.   In practice, however, any such standard would permit obstructionist defendants to remove virtually every case in which the plaintiff dismisses the last removal-spoiling party after the one-year mark.   The removal might not stick, and the case might be remanded, but by then the damage is done: the case is wrested from the state court's hands, the federal court must expend time and resources analyzing the factually intensive remand motion, the litigants must expend money fighting the motion, and the case is derailed.   A pure standard -- even one, like the Court's, that is difficult for defendants to surmount -- will, if not throw the removal process into chaos, at the very least inject unnecessary uncertainty into it. This statement is not mere conjecture; it has support in empirical evidence.   Even before Congress passed the JVCA, some Courts of Appeals began recognizing an equitable bad-faith exception to the one-year limitation.   See, e.g., Tedford v. Warner-Lambert Co., 327 F.3d at 427. As of winter 2011, ninety-six cases were removed on the basis of bad faith in these Circuits; eighty of them -- a staggering 83.3 percent -- were remanded.[22]   See Percy, The Tedford Equitable Exception, supra, at 179 & n.220.   While the Court must faithfully apply the statute that Congress has passed, it does not desire this pattern of improper removal -- and the litigation waste and federal-state friction that comes with it -- to increase by an order of magnitude now that the bad-faith exception applies in all twelve circuits.

---

[22]Even in the Fifth Circuit, which pioneered the bad-faith equitable exception -- and in which district courts had no question regarding the existence of the exception -- courts remanded 78.6% of cases removed on the basis of bad faith.   See E. Farish Percy, The Tedford Equitable Exception, supra, at 179 & n.220.

The Court would be uncomfortable demanding and weighing the evidence that would be most probative to determining whether forum manipulation was the but-for cause of the joinder: the plaintiffs' attorneys' strategy, their opinions about what avenues of discovery are likely to be fruitful, and their impressions regarding likely recovery from various defendants, i.e., the attorney's work-product. The Court concludes that it would be unfair to disclose this proprietary information to the defendants, and, even if the bad-faith exception contemplates in camera review, the Court is resistant to demanding this information from an attorney who might subsequently have to prosecute his or her case in front of the Court. The Court generally avoids putting attorneys on the stand or otherwise in positions where they are obligated to waive privileges to bring out favorable evidence, which might occur if an attorney had good-faith reasons for joining a removal-spoiling party. Even indirect evidence of good faith comes perilously close to prying into the plaintiff's work-product and attorney-client relationship. For example, if the Plaintiffs in this case dismissed Trujillo because he offered to testify against AMCO Insurance, revealing that information at the motion-to-remand stage might undermine the Plaintiffs' plan to conceal Trujillo's cooperation until later. Make no mistake, however: direct evidence of the plaintiff's subjective intent is the best evidence for applying the bad-faith exception; the Court is simply unwilling to impose upon the plaintiff the collateral damage of collecting such evidence.

Practical considerations demand a rule. Plaintiffs will jump through hoops to avoid a federal forum, and the more expansive and mysterious that federal courts construe the bad-faith exception to be, the more silliness in which plaintiffs will engage to demonstrate that their removal-spoiling joinder is in good faith. No standard is likely to change plaintiffs' core motivations in this regard. Although cases like Tedford v. Warner-Lambert Co. involve

plaintiffs who commit acts of outrageously obvious forum manipulation, those plaintiffs did so because they did not know their conduct would be subject to a bad-faith analysis.  The bad-faith exception is now codified in statute, however, and it will not continue to surprise plaintiffs forever.  Plaintiffs will quickly tailor their behavior in state court to avoid meeting the definition of bad faith; the federal courts can try to stay two steps ahead by continually obfuscating the definition of bad faith, but this tactic is inconsistent with basic precepts of American law, which state that the law to be followed should be known to the subject beforehand to give him or her a fair chance to obey.  See note 20, supra, at 77.  A bright-line rule would allow plaintiffs to satisfy the rule's parameters without going to wasteful, unnecessary extremes, and would provide defendants with a consciously designed level of protection.

It is often said that removal is disfavored, and that the courts are to narrowly interpret jurisdictional statutes.  See, e.g., Laughlin v. Kmart Corp., 50 F.3d 871, 873 (10th Cir. 1995); Fajen v. Found. Reserve Ins. Co., 683 F.2d at 333; Martin v. Franklin Capital Corp., 251 F.3d at 1290; Bonadeo v. Lujan, 2009 WL 1324119, at *4 ("Removal statutes are strictly construed, and ambiguities should be resolved in favor of remand.").  The Court concludes that diversity-based removal should be more narrowly construed than federal-question removal.  Several federalism concerns animate this conclusion.  First, the power to interpret law should generally rest with the same sovereign that creates the law.  See The Federalist No. 80 (Alexander Hamilton)(using this line of argument to justify the creation of the federal judiciary to enforce federal law).  Second, when diversity cases come to federal court and there is no state supreme court decision precisely on point, the federal court must predict what the state supreme court would do if it were presented with the case.  See Anderson Living Trust v. WPX Energy Prod., LLC, No. CIV 12-0040 JB/KBM, 2014 WL 2750652, *44 n.30 (D.N.M. May 16, 2014)(Browning, J.)(citing Erie

R.R. Co. v. Tompkins, 304 U.S. 64 (1938)).  The state's own court system, which culminates in the state supreme court, obviously produces more accurate results in this regard.  Furthermore, a federal court risks its credibility when it takes novel positions on issues of state law, as both insiders and outsiders to the legal system generally expect that taking groundbreaking stances on state legal issues -- which often appears to constitute creating or changing state law -- is a task that the state courts more properly handle.  Diversity shifts power from the state government to the federal government; it is a slight and subtle shift, but, given that the Framers' and Congress' enthusiasm for diversity jurisdiction has not been consistent, the Court gives it serious thought.

The foregoing concerns counsel against diversity jurisdiction generally.  The bad-faith exception, however, presents special comity issues.  The exception does all of its work in cases that have been pending in state court for over one year.  In addition to being inefficient, removal at this stage is bound to ruffle feathers.  Normally, diversity suits are either filed in federal court in the first instance or are removed shortly after they are filed in state court, before the state court has done any work on the matter.  Removal after a year, on the other hand, often causes the relationship between the state and federal court to functionally resemble that between a magistrate judge and a district judge, with the former performing the preliminary tasks of managing discovery and motion practice, and the latter trying the case.  It makes state courts into inferior courts of federal courts.  It also causes the state court to devote resources to managing cases they will not try, reroutes all appeals to the federal Courts of Appeals, and, thus, diverts state judicial energy away from producing a body of state case law.  Late removals are, in a word, meddling, from the state courts' perspective.

The Court wrestled with several bright-line-rule constructions of the bad-faith standard before ultimately concluding that none of them were faithful to the statutory text.  The Court will

describe two of them.  The Court notes, however, that even if it devised a workable, textually faithful rule, it would be impossible to meaningfully enforce, i.e., enforce with costs under § 1447(c), unless the Court of Appeals adopted the rule.  A removing defendant cannot know which district judge to which his or her case will be assigned, and, thus, if the defendant's removal argument would succeed under the case law or any district judge in the Circuit, the Court would have trouble finding it objectively unreasonable.

> ### 1.    The Bad-Faith Exception Could Be Construed to Require *X* Amount of Litigation -- Dollars, Depositions, Motions, Et Cetera.

The most obvious objective rule is one that simply converts the Court's standard into a bright-line rule, in the format "any plaintiff who [takes the spoiler's deposition, takes at least ten pages of interrogatories from the spoiler, seeks a default judgment against the spoiler, et cetera] has per se acted in good faith."  The downsides to the rule are obvious: any rule in this format would be extremely arbitrary, and when plaintiffs game the rule -- and they surely would -- by following it literally and doing nothing more, little is accomplished, and in fact the rule itself creates additional litigation waste by compelling plaintiffs to take depositions or send out interrogatories when they may have no interest in doing so.  The main benefit of this rule is that it is a bright-line rule, and would thus cut down on the number of improper or speculative removals in the system.

> ### 2.    The Bad-Faith Exception Could Probably Be Construed to Include a Safe-Harbor Provision That Establishes Good Faith Per Se Whenever the Plaintiff Keeps a Single Removal Spoiler -- Rather Than a Rotating Cast of Different Spoilers -- Joined for the Entirety of the Case's First Year.

Another possible construction of the rule keeps the Court's standard intact, but augments it with a one-way rule -- a "safe harbor" for plaintiffs.  The safe-harbor provision would establish good faith per se if certain objective conditions are satisfied, but does not establish bad faith if

the conditions are not satisfied.  One possible safe-harbor provision would be a single-spoiler rule: essentially, if the plaintiff keeps a single spoiler in the case for the full first year, then the plaintiff has per se acted in good faith.  The primary benefits of the single-spoiler safe harbor are: (i) it provides an objective rule, thus permitting effective policing via § 1447(c) cost assessment and virtually eliminating improper removals; (ii) it encourages plaintiffs to stick with a single spoiler, rather than sequentially naming and then dropping a revolving door of spoilers, thus allowing defendants time to closely examine the plaintiff's factual and legal claims against the spoiler and, if appropriate, develop a fraudulent-joinder argument; (iii) it penalizes the plaintiff whose spoiler successfully moves for dismissal in state court by depriving the plaintiff of the safe harbor -- this undercuts some of the harsh effects of the voluntary-involuntary rule and shrinks the loophole between the voluntary-involuntary rule and fraudulent-joinder doctrine, see Analysis Part I.A.1.b, at 67-68, and (iv) it retains some faithfulness to the statutory text, by retaining the Court's standard as a fallback to the safe harbor.

The Court expects that, under this construction of the bad-faith exception, plaintiffs can and will name removal jurisdiction-defeating parties for one year and dismiss them immediately afterward to secure a state-court forum.[23]  A good rule is one that fulfills its purpose so long as it

---

[23]The Court wants to give effect to Congress' addition of the bad-faith exception, and the Court believes that Congress likely wanted to see an uptick in removable cases when it passed the JVCA.  The Court is aware that this construction of the bad-faith exception would most likely result in few additional proper removals, because plaintiffs will simply keep removal spoilers joined for one year.  The Court responds to this criticism in two ways.  First, the Court doubts that any construction of the bad-faith exception would result in a significant increase in properly removed cases.  The bad-faith exception is an exception to the one-year limitation; thus, its broadest possible construction would be that the exception is coextensive with the rule, i.e., that the bad-faith exception reads the one-year limitation out of existence.  Even this reading would likely result in few additional removals, as plaintiffs would likely just keep removal-spoiling parties joined through trial.  Second, if given the choice between a construction that produces few additional proper removals and many additional wrongful removals doomed for

is followed, even if it is otherwise gamed -- that is, followed to the letter but not an inch further. If a plaintiff keeps a removal-spoiling defendant in the case for more than one year, then removal-desiring defendants will have ample opportunity to develop fraudulent-joinder arguments and remove the case on that basis, if appropriate.  If the plaintiff's basic legal and factual case against the removal-spoiling defendant is sound enough to survive a year of state-court litigation, however, then the defendant's inclusion in the case defeats removal.  The Court is aware that less-than-rock-solid claims can survive in state court even after a year of litigation, but this test -- which equates whether a case against a defendant can survive a year of litigation without being removed for fraudulent joinder with whether the defendant is a proper party to be considered in determining whether the case is diverse and thus removable -- has some support in the statutory text: it is, after all, the basic test that Congress designed when it created the one-year limitation in 1988.  The one-year limitation still exists -- Congress merely crafted an exception to it -- and the Court must not construe the bad-faith exception so broadly as to read the one-year limitation out of existence.

What this construction of the bad-faith exception would prohibit is the sequential naming and dropping of different removal-spoiling parties against whom the plaintiff has no intention of actually litigating -- which is exactly the tactic that the plaintiff used in Tedford.  This practice is more invidious than naming a single removal-spoiling party for one whole year, because when multiple removal-spoiling defendants are joined for shorter time periods, the congressionally prescribed crucible for determining whether a party's inclusion should be counted for purposes of determining removal jurisdiction -- whether the claims against that party can survive more

---

remand, and a construction that produces few additional proper removals and few additional wrongful removals, the Court concludes that Congress would prefer the latter.

than one year of litigation -- is averted.  If no single removal-spoiling party is joined to the case

for more than one year, the safe-harbor rule would be inapplicable, and, upon removal, the Court

would have to engage in a factually intensive inquiry -- the standard that the Court created in this

Memorandum Opinion and Order -- to determine whether the plaintiff litigated in good faith

against the various removal-spoiling parties joined at various times to the case.

> **B.  THE COURT CANNOT PRESUMPTIVELY IMPOSE COSTS ON DEFENDANTS WHO IMPROPERLY REMOVE UNDER THE BAD-FAITH EXCEPTION, BECAUSE EXISTING SUPREME COURT PRECEDENT BARS THE COURT FROM DOING SO.**

The Court could also attempt to curb the number of wrongful removals by presumptively

imposing costs in cases that it remands, but this approach risks being unfair to defendants.

Defendants who see a nebulous, undefined standard and argue that their case falls within it do

not necessarily deserve to be sanctioned.   They might not even be removing in bad

faith -- whatever that term means in this context.  Moreover, while the imposition of costs may

provide a deterrent, it does nothing to solve the greater problem: uncertainty about what the

exception means, which translates into uncertainty about which forum should hear the case.

Still, if the courts must apply the bad-faith exception, and if they must apply it as a pure

subjective standard without an objective safe-harbor provision, then the courts could

presumptively impose removal costs against defendants on all cases that it remands.   The

Supreme Court, in an opinion written by the Honorable John G. Roberts, Chief Justice of the

United States, has foreclosed this option.  See Martin v. Franklin Capital Corp., 546 U.S. at 136.

In that case, the Supreme Court upheld the Tenth Circuit's holding that, "absent unusual

circumstances, attorney's fees should not be awarded when the removing party has an

objectively reasonable basis for removal."   546 U.S. at 136.   One approach could be that

improper removals under the bad-faith exception -- which did not exist in 2005, when Chief

Justice Roberts wrote his opinion -- categorically constitute "unusual circumstances," but, after candidly evaluating existing precedent, the Court concludes it cannot create such a rule while remaining faithful to vertical stare decisis.  The Tenth Circuit or the Supreme Court would have to declare such a rule.

## III.    THE PLAINTIFFS DID NOT ACT IN BAD FAITH TO PREVENT REMOVAL, BUT, BECAUSE AMCO INSURANCE HAD AN OBJECTIVELY REASONABLE BASIS FOR REMOVING THE CASE, THE COURT WILL NOT IMPOSE COSTS.

To defeat the Motion, AMCO Insurance would need to establish that both the State Defendants and Trujillo were kept in the case in bad faith; in fact, neither were.  The Plaintiffs deposed Trujillo, even after he first rebuffed them with his Fifth Amendment right to remain silent.  Moreover, their case against Trujillo was such a slam dunk that the only possible argument that AMCO Insurance could make is that good faith requires a plaintiff to realistically expect monetary recovery from the removal-spoiling defendant.  The Court concludes that a good-faith plaintiff need not seek a judgment at all -- discovery is a perfectly legitimate end for naming a defendant, provided the claims asserted are not frivolous.  Even if the Court were to demand that plaintiffs seek to keep removal-spoiling defendants in the case all the way to verdict and judgment, there are reasons other than money, such as emotional closure or a sense of justice, to take a defendant -- especially a defendant like Trujillo, who murdered the Plaintiffs' son and brother -- to trial.

The Plaintiff's good faith is even clearer regarding the State Defendants.  The Plaintiffs actively litigated their case against the State Defendants, ultimately culminating in an undisclosed monetary settlement.  AMCO Insurance makes hay out of the fact that the State Defendants, despite having already hammered out the terms of the settlement agreement, did not get around to filing their stipulation of dismissal until November 18, 2013 -- which, AMCO

Insurance enthusiastically points out, is exactly one year from the date when the Plaintiffs joined AMCO Insurance.  The date that the Plaintiffs joined AMCO Insurance, however, is not the date from which the one-year limitation is measured; the one-year limitation is measured from the initial filing date, and, on May 24, 2013, exactly one year after the filing date, the Plaintiffs were still actively litigating against the State Defendants, presumably negotiating potential settlement possibilities.  It may be somewhat unfair to measure the one-year limitation from the filing date, as it deprives the late-joined defendant of the full year of potential removability -- if, for example, the late-joined defendant could have developed a fraudulent-joinder argument if given the time, or if the case became completely diverse at some point before the plaintiff named the late-joined defendant to the case -- he or she would have had if joined from the beginning.  The statute's text is clear, however, and the one-year limitation bars removal "more than 1 year after commencement of the action," not after the joinder of the removal-seeking defendant.  Also, this supposed unfairness is largely illusory, as the early-joined defendants can make the same arguments and exercise the same diligence in pursuing removal as the late-joined defendant would have.  While the late-joined defendant is thus at the mercy of the early-joined defendants in this regard, defendants are always at each other's mercy vis-à-vis removal, as all defendants must unanimously consent to removal.

AMCO Insurance's only remaining argument is that the Plaintiffs acted in bad faith by obscuring the amount in controversy.  This argument fails for two reasons, either of which would be adequate on its own to defeat removal.  First, because both the amount-in-controversy requirement and complete diversity must be satisfied to warrant removal, amount-in-controversy obfuscation cannot be the but-for cause of a case being unremovable unless: (i) the case became completely diverse before the amount in controversy was established; or (ii) the case would have

become completely diverse before the amount in controversy was established, but for the plaintiff's bad-faith joinder of a removal spoiler.  If, on the other hand, there is good-faith incompleteness of diversity until after the amount in controversy is known -- or, more accurately under McPhail v. Deere & Co., knowable -- then the bad-faith amount-in-controversy obfuscation, even if it existed, is harmless.  In this case, AMCO Insurance argues that the Plaintiffs concealed the amount in controversy until April 22, 2014, when they served it with an offer of settlement.  Even if that were the case, Trujillo -- whom the Court has already decided was joined in good faith for his entire time in the case -- was not dismissed until three days later.  Because the case was not completely diverse even after the establishment of the amount-in-controversy requirement, and the case was more than a year old, the one-year limitation would bar removal even if the Plaintiffs had obfuscated removal in bad faith until April 22, 2014.  Second, under the McPhail v. Deere & Co. approach -- which survives the JVCA's passage and thus binds the Court -- the amount-in-controversy requirement was satisfied from the day it was filed.

All Defendants had reason to know on the date of filing that this case satisfied the amount-in-controversy requirement.  For a federal court to have original jurisdiction over a diversity dispute, a single plaintiff -- or multiple plaintiffs asserting claims that are not "separate and distinct," as is the case here -- must be able to potentially recover more than $75,000.00 from a single defendant.  Martin v. Franklin Capital Corp., 251 F.3d at 1292.  See Martinez v. Martinez, 2010 WL 1608884, at *18.  Here, the Plaintiffs' claims against Trujillo almost certainly, let alone potentially, exceeded $75,000.00, and thus the amount-in-controversy component of original jurisdiction over the Trujillo claims was satisfied.

Once original jurisdiction over the Trujillo claims is satisfied, a federal court can exercise jurisdiction over all claims that "derive from a common nucleus or operative fact."  United Mine Workers of Am. v. Gibbs, 383 U.S. at 725.  Even if the Plaintiffs' claims against AMCO Insurance never independently satisfied the amount-in-controversy requirement, and, thus, a federal could not exercise original jurisdiction over the AMCO Insurance claims, the federal court could still exercise supplemental jurisdiction over those claims.  The supplemental jurisdiction statute provides:

> **(a)** Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.
>
> **(b)** In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

28 U.S.C. § 1367(a)-(b).

Although subsection (b) has been interpreted by some courts to forbid the joining of defendants in diversity cases who do not individually satisfy the amount-in-controversy requirement, the better reading of "when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332" is that it prohibits only the joining of nondiverse parties.  If a plaintiff in a diversity case asserts claims exceeding the amount-in-controversy threshold against diverse defendant $x$, then joining diverse defendant

*y* with claims underneath the amount-in-controversy requirement (i) does not impart original jurisdiction over the claims against *y*, but (ii) nor does it defeat the original jurisdiction that existed over the claims against *x*, and thus (iii) the joinder is not, in any meaningful way, "inconsistent with the jurisdictional requirements" of diversity.  28 U.S.C. § 1367(b).  Joining nondiverse defendant *z*, however, not only results in a lack of original jurisdiction over the claims against *z*, but also defeats the original jurisdiction the court previously had over the claims against *x*, because that jurisdiction depended upon complete diversity.   The latter situation -- joining *z*, a nondiverse party -- is what § 1367(b) means when it refers to "exercising supplemental jurisdiction inconsistent with . . . section 1332."  28 U.S.C. § 1367(b).

This case satisfied the amount-in-controversy requirement as to Trujillo from day one, which means that no separate amount-in-controversy requirement exists as to AMCO Insurance, which, as a diverse party, can be joined under supplemental jurisdiction.  Even if the Plaintiffs had obfuscated the amount in controversy in bad faith until April 22, 2014, however, this bad faith would still not be a but-for cause of the case's unremovability.

Because the Plaintiffs did not act in bad faith, the one-year limitation bars the removal, and the Court will remand the case to state court.  The Court will not, however, require AMCO Insurance to pay the costs or expenses that the Plaintiffs incurred because of the wrongful removal.  See 28 U.S.C. § 1447(c).  The Supreme Court has limited district courts' discretion to impose costs and fees to those cases in which the removal was objectively unreasonable.  See Garret v. Cook, 652 F.3d 1249, 1254 (10th Cir. 2011)("[C]ourts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal.").  AMCO Insurance's removal was objectively reasonable.  No court has yet attempted to define the bad-faith exception, and AMCO Insurance's points about being unable to discern

the amount in controversy, the suspicious timing of the State Defendants' dismissals, and Trujillo being self-evidently judgment-proof from the start, are well-taken.  In the future, as the bad-faith exception develops some much-needed clarity and standardization, the Court may be inclined to grant costs and expenses; when all is said and done in this case, AMCO Insurance removing the case six days before trial will probably ultimately set the case's resolution back by a year, burden the dockets and disturb the calendars of both the state and federal court, and exact an unknown number of dollars of litigation costs.  Today, however, AMCO Insurance's actions were objectively reasonable, and imposing costs would therefore be unwarranted.

The Court will make one last comment about the bad-faith exception.  Assume that the State Defendants had been dismissed from the case before the one-year mark, and the Plaintiffs had not deposed Trujillo.  Assume that their reasoning for naming Trujillo, the man who murdered their son, was to obtain justice in a case to which they, not the State of New Mexico, are parties -- to seek affirmation of the evil that Trujillo wrought, not just on society or law and order, but on the victim's family.  Assume that, on the advice of their attorney, the Plaintiffs sought no discovery from Trujillo, knowing Trujillo is judgment-proof and any funds spent on discovery would be wasted, and also knowing that Trujillo's murder conviction would provide all the evidence the Plaintiffs needed to prosecute their claims against him.  Under the Court's standard, such actions would be considered bad faith; if the Plaintiffs were to come to a legitimate peace with their situation and drop Trujillo from the case, they would be penalized -- not just by being forced to litigate in a less-friendly forum, but by being forced to switch forums mid-case.  This case is not all that far away from one in which removal sticks.

**IT IS ORDERED** that the Plaintiffs' Motion to Remand, filed May 28, 2014 (Doc. 12), is granted.  The case is remanded to the State of New Mexico First Judicial District Court, County of Santa Fe, State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Matthew L. Garcia
Mary E. Schmidt-Nowara
Garcia Ives Nowara LLC
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

David M. Wesner
Dixon, Scholl & Bailey, PA
Albuquerque, New Mexico

--and--

Lisa E. Pullen
Civerolo, Gralow, Hill & Curtis, PA
Albuquerque, New Mexico

--and--

Gregory L. Biehler
Jill M. Collins
Beall & Biehler
Albuquerque, New Mexico

    *Attorneys for the Defendant*